**In re James Lee PARKER, Bankrupt.**

**UNITED AMERICAN BANK, Plaintiff,**

**v.**

**James Lee PARKER, Defendant.**

**Bankruptcy No. BK–3–79–146.**

United States Bankruptcy Court,
E. D. Tennessee.

Nov. 7, 1979.

Dale C. Workman, for plaintiff.

Cheryl T. Humble, for defendant.

### MEMORANDUM

CLIVE W. BARE, Bankruptcy Judge.

#### I

The plaintiff, United American Bank, asserts the nondischargeability of a debt under § 17a(2) of the Bankruptcy Act.[1] The debt, which totaled $2,945.62 at the time of bankruptcy, arose from the use of a Master Charge card and a Visa card. Trial was held July 10, 1979. Findings and conclusions follow.

---

1. "A discharge in bankruptcy shall release a bankrupt from all of his provable debts, whether allowable in full or in part, except such as . . . (2) are liabilities for obtaining money or property by false pretenses or false representations, . . . ." § 17a(2), Bankruptcy Act (11 U.S.C. 35a(2)).

During the summer of 1978, United American Bank (Bank) requested that a local credit bureau send the Bank a list of all persons who met the Bank's "credit criteria," that criteria being good lines of credit at three (3) different stores or establishments. The Bank then had letters mailed to those persons who met the "criteria" inviting them to sign and return an enclosed invitation in order to obtain a Master Charge card, Visa card or both. Several thousand people received such letters.

Parker received his "invitation" on or about September 20, 1978.[2] He supplied the requested information, consisting only of (1) type and number of cards; (2) place of employment; (3) home phone number; (4) signature, and (5) date, indicating his desire to obtain the cards. The letter to Parker clearly stated "no application is necessary. Just sign and return our invitation!"

Parker received one Master Charge card and one Visa card. In the brief submitted to his court Parker's attorney stated that Parker received a statement that his credit on each card was $400 (See Exhibit 3). However, no such statement appears on the exhibit. Parker testified at the trial on dischargeability that a "couple of days" after receiving the cards he was told by a teller at one of the Bank's branch offices that the limit was probably "about $800." The testimony is unclear as to whether the $800 limit was on each card or on both.

From October 25, 1978, to December 24, 1978, Parker made forty-five (45) charges on the Master Charge account, totaling $1,111.83. From October 22, 1978, to January 11, 1979, he made seventy-six (76) charges on the Visa account, totaling $1,833.79. (See Exhibit 4).

Plaintiff's bank card manager, Bruce Harrington testified that it is the Bank's policy to send a series of notices once the credit limit has been exceeded. At the trial the Bank was only able to produce one notice on each card. Both were dated November 11, 1978. Parker testified that he never saw any notices because his wife handled the family mail. Mrs. Parker testified that she saw one notice on each account sometime in November.

Mrs. Parker was contacted at her place of employment by a Bank employee in early January 1979. She agreed that she and her husband would begin payments of $15.00 per week on each account. She testified that she was not asked to return the cards at that time. A $30.00 payment was made on the Master Charge account on January 29, 1979, followed by $15.00 payments on February 6 and February 19, 1979. Two payments of $15.00 each were made on the Visa account; one on February 6, 1979, and the other on February 19, 1979. On or about January 23, Mrs. Parker was again contacted by the Bank and asked to return the cards. It is not clear from the record whether the cards were mailed to the Bank or delivered personally by Mrs. Parker.

2. UNITED AMERICAN BANK

United American Bank would like to offer you unprecedented worldwide charging power! It's yours with Master Charge and Visa, the two most useful credit cards in the world. Even if you already have one of our cards, United American Bank has made it as easy as possible for you to enjoy the charging power of both cards. No application is necessary. Just sign and return our invitation!

Each card alone is welcomed at over 2 million merchants in 117 countries, and ready cash is at your disposal from nearly 60,000 banks worldwide. Also, when you accept BOTH Master Charge AND Visa from United American Bank, you are establishing two new lines of available credit, over and above the credit you may already have with any other cards—even with Master Charge and Visa from another bank.

And since United American Bank gives you the service that only a local bank can offer, we're as near as the phone to answer any questions concerning your Master Charge AND Visa accounts, quickly and courteously.

So don't delay! Sign the invitation below and return it in our postpaid envelope today; that's all there is to it! Worldwide charging power awaits you—with Master Charge or Visa, or both, from United American Bank.
Sincerely,
Jurrel L. Stapleton
Credit Manager
JLS/ajw
Enclosure

However, it is not disputed that the cards were promptly returned.

During the period from November 29, 1978, to February 22, 1979, the Bank sent monthly statements to Parker indicating that his account was past due. These statements requested a minimum payment required to make the accounts current. The payments requested were well below the total amount of the accounts. The statements did not indicate that the accounts were above the credit limit nor did they request a payment sufficient to bring the account within the line of credit.

Parker first contacted an attorney on February 20, 1979. His petition in bankruptcy was filed March 7, 1979.

## II

This Court has previously held, in *Valley Fidelity Bank & Trust Company v. Robert Lewis Williamson,* 1 Bankr.Ct.Dec. 15 (ED Tenn.1974), that the exceptions set forth in Section 17a(2) of the Bankruptcy Act are to be strictly construed, citing with approval *Gleason v. Thaw,* 236 U.S. 588, 35 S.Ct. 287, 59 L.Ed. 717 (1915) and *Sweet v. Ritter Finance Co.,* 263 F.Supp. 540 (WD Va., 1967). On the question of what type fraud is contemplated by Sec. 17a(2), this Court cited with approval the following authorities and treatises:

"No one can seriously dispute the fact that the Bankruptcy Act contemplates positive fraud as distinguished from implied fraud." *Sweet v. Ritter Finance Co.,* supra.

"Actual fraud is intentional fraud, an intent to deceive being an essential element thereof. It means fraud according to the common conscience, and that the party charged therewith was inspired by a deliberate, fraudulent purpose to injure and deceive the party complaining; it implies deceit, artifice, and design, and imports the active operation of the mind; it consists in deception, intentionally practiced to induce another to part with property or to surrender some legal right, and which accomplishes the end designed; and it includes cases of the intentional

and successful employment of any cunning, deception, or artifice used to circumvent, cheat, or deceive another. Falsehood is an ingredient thereof." 37 C.J.S. 210.

". . . (F)raud is regarded as criminal in its essence, and involves moral turpitude at least, . . . ." 37 C.J.S. 399.

"Actual fraud is intentional fraud. It consists in deception intentionally practiced to induce another to part with property or to surrender some legal right, and which accomplishes the end designed.' 26 C.J. 1060." *Independent Life Insurance Co. v. Yates,* 12 Tenn.App. 331 (1930).

In discussing dischargeability of debts under Sec. 17a(2) of the Bankruptcy Act, Remington states:

"All the elements of actionable fraud must be present before a claim can fall within the the exception, and it must accordingly appear (1) that the defendant made a material representation; (2) that it was false; (3) that he made it when he knew it was false, or made it recklessly, without any knowledge of its truth and as a positive assertion; (4) that he made it with the intention that it should be acted upon by plaintiff; (5) that plaintiff acted in reliance upon it; and (6) that he thereby suffered injury." Remington on Bankruptcy, 6th Ed., Vol. 8, Sec. 3320. *Williamson,* supra.

The degree of proof required under Sec. 17a(2) is not set out in the Bankruptcy Act. The ordinary rule in civil cases is that the objecting creditor must prove its case by a preponderance of the evidence. Some courts have held that the case must be proved by clear and convincing evidence when grounded on fraud. See *Matter of Campbell,* 46 Am.Bank.L.J. 286 (SD Ohio 1972); *Matter of Smith,* No. 71–7918 (ED Ky.1972), unreported.

The Court of Appeals of Tennessee in *Williams v. Spinks,* 7 Tenn.App. 488 (1928), cert. den., stated the rule as follows:

"On the sufficiency of evidence to establish fraud, it has been stated that the

evidence must be clear and satisfactory. Some authorities hold that it must be clear, cogent and convincing or strong and decisive. The general rule is that the evidence to be sufficient to establish fraud should prove a state of facts which is not fairly or reasonably reconcilable with fair dealing and honesty of purpose, and which would lead a reasonable man to the conclusion that fraud in fact existed. R.C.L., Vol. 12, Sec. 183."

■ Sec. 17a(2) uses two phrases, "false pretenses" and "false representations." False pretenses refers to implied representations or conduct intended to create and foster a false impression. False representations may appropriately mean express misrepresentations. *Williamson,* supra. An intended deceit is essential in either case. *Davison-Paxon Co. v. Caldwell,* 115 F.2d 189 (5th Cir. 1940). That case involved an alleged nondischargeable debt under § 17a(2) of the Act. An insolvent purchased goods without disclosing her financial condition, even though she knew that credit would not have been extended to her if she had disclosed her financial condition. The court held that the statute excepts from discharge only those obligations where there is "actual overt false pretense or representation."

In *Weigand v. Furniss,* 85 Idaho 189, 377 P.2d 371, 372 (1962), the court stated that § 17a(2) of the Bankruptcy Act contemplates "the perpetration of intentional fraud as distinguished from constructive fraud . . . positive fraud as distinguished from implied fraud, or fraud in law."

### III

In the case before this court, the Bank has failed to show that Parker made an intentional overt pretense or representation. The letter soliciting the accounts stated that "No application is necessary." The "invitation" requested only the number of type of cards desired, the defendant's place of employment, his home phone, his signature and the date. The Bank made no inquiry into Parker's financial condition.

From the time he requested the cards through December 1978, the period in which most of the purchases were made, both Parker and his wife were employed. Parker testified that he intended to pay the amount of the debts. When questioned as to the reason he exceeded the credit limit by such a large amount he stated that he did not know what the credit limit was and that he "didn't realize that there was that much charged on the cards." In a similar case the Bankruptcy Court for the Western District of Wisconsin observed that:

"such protestations would be given little credence in many cases. But here the defendants were unschooled in monetary matters. They were young and the ease with which the plaintiff dealt with them may well have contributed to their illusion that they would be able to pay their rapidly mounting debts. Certainly the issuer of credit cards who has never seen or interviewed the applicants must take into account the high probability that the cards will come into the hands of many who are extremely naive and will make charges beyond their ability to pay, but with the honest belief, however unwarranted it may seem to a more reasoning mind, that they can and will pay." *Affiliated Bank of Madison-BAC v. William Henry Dyer and Diane K. Dyer,* 4 Bankr. Ct.Dec. 180, 181 (WD Wisconsin 1978).

In the *Dyer* case the bank had placed application forms for credit cards in a department store. The bankrupts completed an application while shopping and mailed it to the bank. Within a week they received a card with a credit limit of $500. Within a year their account totaled $7,509.01. The bank made several requests for minimum payments and finally asked that the cards be returned. The court held that all debts were dischargeable except for $557 charged after the bank requested that the cards be returned.

■ Exceeding the credit limit in itself is not sufficient to sustain nondischargeability. *Williamson,* supra. There is no evidence that Parker received any notice of over limit statements. The Bank has at-

tempted to impute Mrs. Parker's knowledge of the over limit statements to Parker. However Mrs. Parker did not apply for the cards and she was not a party to the debts owed to the Bank. Both Mr. and Mrs. Parker testified that she did not inform him that the Bank had sent any over limit notices.

The monthly statements sent by the Bank requested minimum payments that were much less than the total amount owed. In addition the minimum payments requested would not have brought the accounts within the credit limits. It has been held that by requesting a minimum payment well below the total amount due that the Bank had "acquiesced in the course of action carried on by the bankrupt. The payment obligation was pro-rata over a period of future time rather than lump sum. Presumably if such stated monthly payments were made, such future periodic payments including interest was satisfactory with the bank. Such action on the part of the bank constituted a change of the written agreement and ratified through the bank's action an enlarged limitation on credit." *Zions First National Bank v. J. L. Whitehead*, 2 Bankr. Ct.Dec. 1647, 1650 (Utah, 1976).

The Bank has also failed to show that Parker intentionally kept his purchases under $50 to avoid a credit check. Parker testified that he was aware that sometimes a store would make a call to check his credit on some purchases but he was not aware that purchases of $50 or more were checked. Out of a total of one hundred twenty-one (121) purchases there were thirteen (13) instances of multiple charges in the same store on the same day; five (5) would have exceeded $50 if combined.

There is nothing in this case to indicate that Parker went on a spending spree in contemplation of bankruptcy. Mrs. Parker returned the cards to the Bank when requested to do so in January, 1979. No purchases were made subsequent to the request to return the cards. The last purchase was made January 11, 1979. This was more than a month before Parker first contacted an attorney concerning his financial situation.

The Bank has failed to carry the burden of proof required to hold the debt nondischargeable under Sec. 17a(2).

This memorandum constitutes findings of fact and conclusions of law, Bankruptcy Rule 752.