In the Matter of Gerald GREENWALD, Bankrupt.

BACHE HALSEY STUART SHIELDS INC., Plaintiff,

v.

Gerald GREENWALD, Defendant.

BEAR, STEARNS & CO., Plaintiff,

v.

Gerald GREENWALD, Defendant.

SMITH BARNEY, HARRIS UPHAM & CO., INCORPORATED, Plaintiff,

v.

Gerald GREENWALD, Defendant.

Bankruptcy No. 79–618–BK–WMH–B.
Adv. Nos. 1–4.

United States Bankruptcy Court, S. D. Florida.

Nov. 28, 1979.

Bennett Falk, Miami, Fla., for plaintiff.

Robert E. Venney, Miami, Fla., for bankrupt.

## FINDINGS AND CONCLUSIONS

THOMAS C. BRITTON, Bankruptcy Judge.

In these adversary complaints, three stockbrokers seek determinations that their claims against the bankrupt are non-dischargeable under § 17a(2) of the Act [11 U.S.C. § 35]. The bankrupt has answered each complaint. With the consent of the parties, the three matters were tried together on a single record. The trial was held on October 18, 1979. This order is a memorandum of decision under B.R. 752(a).

By stipulation during the trial, all of the record before me in Adversary Proceeding No. 1, an action by a bank against the bankrupt under § 14c(3) of the Act tried on the same day, is made a part of this record with the same effect as if that evidence had been received in the trial of these cases.

Plaintiffs claim that the bankrupt purchased options through them at a time when he did not have the resources to pay for this property and that he had no inten-

tion of paying. This conduct, if proven, constitutes the obtaining of property by the false implied representation that payment will be made, a ground for non-dischargeability under § 17a(2). *Matter of Boydston*, 5 Cir. 1975, 520 F.2d 1098, 1101; *Matter of Wood*, 5 Cir. 1978, 571 F.2d 284; *Collier on Bankruptcy* (14th ed.) ¶ 17.16[3] n. 22. I believe that our Circuit's earlier contrary holding in *Davison-Paxon Co. v. Caldwell*, 5 Cir. 1940, 115 F.2d 189 does not presently preclude the conclusion I have expressed.

■ The circumstances from which plaintiffs infer that the bankrupt could not pay for his purchases and had no intention of doing so are as follows. The bankrupt is a dermatologist who has practiced for nine years and who moved to Florida in 1973. The income from his practice has grown steadily and currently exceeds $150,000 a year. Despite this circumstance, his debts have exceeded his assets for most if not all of the time since he became a physician in 1967. He began investing in securities in 1971 and he began to trade in options in 1974.

By mid-April, 1979, he was buying options through five different brokers to whom he owed a total of over $66,000 and he held over 1,100 options in twenty different stocks. These options had cost $135,000. Over three quarters of his security investments were in options, most of which were short term options. This class of investment is highly speculative and the market is so volatile that typically nine options out of ten become valueless.

On May 24, 1979, defendant filed for bankruptcy with debts exceeding $284,000 (of which $100,000 was owed to brokers) and with non-exempt assets of less than $20,000.

The bankrupt claims that he did not understand the risk involved in these investments and relied upon his brokers to see to it that his accounts never reached a negative position. I reject this line of defence, if it be a defence, because I find the bankrupt to be an unusually intelligent and experienced individual who could not have been as naive as his pleadings and some of his testimony suggests. Indeed, at one point he considered selling his expertise to other investors, and in 1976 he qualified as a Investment Advisor under the Investment Advisors Act.

The bankrupt has also insisted that he was at all times confident of his ability to pay for his options on the settlement dates specified in each instance by the brokers from profits made out of earlier options and, if necessary, from his medical practice income. He is married, with six children, and was actively planning the purchase or construction of a $400,000 home during the time he was investing in options. When brokers began to call upon him to settle his account or suffer liquidation of the account, he borrowed money from several banks using a substantial part of these amounts to pay for his purchases. The bankrupt is not the type of person who would be likely to embark upon a deliberate scheme to defraud his brokers or to believe that he could do so. If he had that intention, he would hardly have borrowed money in order to pay those brokers nor would he have made the other substantial payments he made upon his several accounts.

I believe that the bankrupt began and for some time continued his pattern of investments in options with the intention of paying for his purchases as they became due and with reasonable expectation that he would be able to do so. In fact, an analysis prepared by an accountant after the fact shows that his four brokerage accounts throughout the month of April, 1979, could conceivably have been worth more than the amount he owed his brokers. That amount, which totalled $47,000 on April 9, grew to $99,000 on April 27. No firm conclusion can be drawn from this analysis because of the way values were assigned to the portfolio. However, there is no contrary evidence that the amount owed brokers exceeded the portfolio during this period.

We do know, of course, that by May 24, 1979 when he filed for bankruptcy, the bankrupt was hopelessly insolvent and recognized that fact. He continued making purchases from these brokers up to April 30, 1979. I am convinced that at some point before his purchases ended, the bankrupt knew that he could not pay for additional

purchases, but continued to make them in a desperate gamble to extricate himself. I cannot fix the time this transition took place, but on April 20, 1979, the bankrupt candidly admitted to one of his brokers, in a note he wrote that day, that his option trading "has wiped me out financially. . . it would take a miracle to recoup". From this circumstance, I find that on April 20, 1979, the bankrupt knew that he could not pay for purchases made on that day or thereafter and that he had no intention of paying for purchases made on that day or thereafter.

The bankrupt appears (Exhibit A) to have made the following purchases after that date:

| | |
|---|---|
| Smith-Barney: | $44,604.75 |
| Bear-Stearns: | 11,117.83 |
| Bache: | None |

It is not clear from the evidence before me what part, if any, of these purchases remain unpaid. It is plaintiffs' burden to present this evidence and this court's duty under § 17c(3) of the Act to give judgment for the non-dischargeable debt. If the parties cannot agree as to the amounts due each plaintiff, this case will be reopened for evidence on this point only on *December 13, 1979 at 9:30 A.M. in Courtroom No. I, 808 Ainsley Bldg., 14 N.E. First Ave., Miami, Florida.*