**UNITED BANK OF DENVER, Master Charge Division and Visa Division, Plaintiff,**

v.

**Joseph Melvin KELL, Debtor/Defendant.**

**Proceeding No. 80 M 1410.**

United States Bankruptcy Court, D. Colorado.

Oct. 27, 1980.

---

Dennis P. Walker, Denver, Colo., for plaintiff.

Jeffrey L. Hill, Denver, Colo., for debtor/defendant.

## MEMORANDUM OPINION

JOHN P. MOORE, Bankruptcy Judge.

THIS MATTER arises upon a complaint to determine the dischargeability of a debt pursuant to 11 U.S.C. § 523(a)(2)(A) which excepts from discharge any debt for obtaining money, property, or services by "false pretenses, a false representation, or actual fraud * * *." The alleged false pretense or fraud asserted in this case was the Defendant's continued use of credit cards issued by the Plaintiff at a time when the Defendant was insolvent, a Chapter 13 debtor, and when the Defendant knew or should have known he was and would be unable to repay the debts incurred with the use of those cards.

1. This is a separate card from the one issued in 1979, and the two should not be confused.

The Defendant is a 48–year old mechanical engineer employed by an internationally known company in a responsible supervisory position. His demeanor and speech clearly indicate he is a person of above average intelligence. Yet, the tale which unfolds about this Defendant is a saga of a man who, for various reasons, and despite his intelligence, has obviously chosen to live beyond his means. While there are unrefuted reasons which underlie the choice, it is nonetheless manifest that the Defendant has placed himself in debt far beyond any reasonable and justified expectation that he would be able to extricate himself. This case must be judged in light of that circumstance.

While the instant complaint deals with a Mastercharge and a Visa card issued the Defendant by The United Bank of Denver (Bank) in the month of November, 1979, there are germane dealings between the parties which arose prior to that time. It appears that the Bank had issued a Mastercharge card to the Defendant and his former wife in October, 1977.[1] The details of the transactions between the parties emanating from this relationship are not essential. Suffice that for one reason or another this account was substantially in arrears on October 4, 1979 with a balance due on that date of $2,064.45.

The date is significant because it was on that day the Defendant chose to write the Bank stating:

I am gravely concerned over my account and I am writing to explain my situation. Since, earlier this year I was involved in a bitter divorce action which has now finally ended. However, this divorce action has put me in a bad financial situation presently because *all of my assets were awarded to my ex–wife leaving me broke.*

I am therefore unable to currently maintain my minimum payment requirement and shall only be able to pay $75.00 per month until my situation improves. Your help and understanding in this matter will be appreciated. (emphasis added)

The letter is significant because on the same day as the letter is dated, the Defendant had a telephone conversation with Geri Japhet, a Bank collector. During the course of this conversation the Defendant told Ms. Japhet he was unable to pay the arrearage on the account. He suggested the Bank make a settlement with him because he was contemplating bankruptcy.[2] No settlement was agreed upon, however.

Approximately six days after this conversation, the Defendant returned his Mastercharge card to the Bank apparently in compliance with a demand made by Ms. Japhet. Despite the return of the card, the Defendant made one payment of $75.00 on this account which was credited to his balance on October 18, 1979.[3] Thereafter, the account remained dormant and no further payments were made by the Defendant.

Then, on October 26, 1979, only two weeks after returning his former credit card because of his inability to pay, the Defendant made application to the Bank for both a Mastercharge and a Visa account. Despite the return of his original Mastercharge card, the Bank apparently made no connection or cross reference between this application and Mr. Kell's prior Mastercharge account.[4] It should be noted, however, that the Defendant's application did not disclose the debt owed the Bank on the former Mastercharge account even though the application required the listing of "all current obligations".

Indeed, it would appear from a comparison of the Chapter 13 Statement signed by the Defendant on October 31, 1979, only four days after he filed his credit application with the Bank, that the Defendant omitted from the credit application reference to no less than 13 other then current obligations. A subsequent amendment to the Chapter 13 Statement filed on December 21, 1979 discloses six additional obligations which were also in existence at the time of his application but undisclosed therein.[5]

Before the Bank could act upon the Defendant's application, he made good on his statement to Ms. Japhet and filed a Chapter 13 petition on November 2, 1979. Because the Bank was not scheduled as a creditor in the Chapter 13 Statement, a notice of the filing was not sent to it. Nonetheless, some notice was apparently received, for the cards pertinent to the Defendant's original account bear a legend indicating the communication of the Defendant's bankruptcy case number to the Bank by the Defendant's counsel on November 6, 1979.[6]

Despite the bankruptcy filing, the Bank proceeded to investigate Mr. Kell's application. Astounding as it may seem, the application was approved on November 22, 1979. The decision, however, was based only upon the facts contained in the application and the contents of a credit bureau report.[7]

Mr. Kell acknowledges the apparent inconsistency between filing a bankruptcy petition and contemporaneously seeking a new line of credit from a pre–bankruptcy creditor, but he attempts to justify the inconsistency on the basis he was simply trying to "re–establish" himself following the financial disaster occasioned by an earlier divorce. He also avows that even though his bankruptcy petition was verified only five days after he applied for the credit

---

**2.** The Defendant has denied making the statement; however, given the relative bias of the witnesses, what they have to gain from their testimony, and other instances in which Mr. Kell's testimony was demonstrably inaccurate, I would find Ms. Japhet to be more credible.

**3.** See Plaintiff's Exhibit H.

**4.** It is not the practice of the Bank to cross reference all applications. According to Ms. Saenz of the Bank's Mastercharge–Visa Division, "This was just a case of the left hand not knowing what the right hand was doing."

**5.** While this disparity has not been raised in the complaint, it is certainly a part of the fabric of this case as it bears upon the nature of the Defendant's conduct.

**6.** See Plaintiff's Exhibit H.

**7.** In fairness, it should be stated that apparently because of the size of the Bank, the person approving the application was not aware of Mr. Kell's bankruptcy.

698

cards, he had already forgotten the credit card application had been made.

Nevertheless, the Defendant started using the Visa card in December, 1979. Thereafter, for a period of the next several months the Defendant used both cards amassing a Visa balance of $1,207.16 and a Mastercharge balance of $1,273.22. Both balances are net of payments of $361.00 and $230.00 respectively.

While the Defendant was using these credit cards, Mr. Kell was under an obligation to pay the Chapter 13 Trustee $200.00 per month in accordance with the plan confirmed by the Court on January 3, 1980. According to the budget on file in this case, this should have left the Defendant a monthly surplus of $261.00 over his regular monthly living expenses.

Apparently, such was not the case, however. According to the record, the Defendant made only two payments to the Trustee between the date of confirmation and June 6, 1980, the date on which the case was converted to Chapter 7. Moreover, including the Mastercharge and Visa obligations, he amassed seven new unsecured debts totalling $17,100.00 from the time the Chapter 13 petition was filed to the date of conversion. See: Amended Schedule A–3, filed June 9, 1980.

When asked what this new debt represented, the Defendant stated that in January, 1980, his mother had become terminally ill, and he made five trips to Atlanta, Georgia, where she lived. In addition to the cost occasioned by those trips, he contributed to payment of the expenses of her illness and subsequent burial. The money for these expenses came from credit obligations incurred and set forth in the amended A–3 schedule.

According to Mr. Kell's testimony, these expenditures totaled $9,230.00. Taking into account the Bank's Visa and Mastercharge debts together with an unrelated attorney fee, the amended A–3 schedule thus represents debts of $4,000.00 for which Mr. Kell cannot account. When this is coupled with the fact that Mr. Kell was unable to make required Chapter 13 payments in the amount of $800.00, and thus apparently consumed his monthly budgetary excess of $261.00 (or $1,827.00 for the period of seven months) some things become evident.

First it is clear that during the period from December, 1979 through May, 1980, Mr. Kell was accumulating debt greater than his ability to pay. Second, at the rate this debt was accumulating—over $2,400.00 per month—it is clear he did not have sufficient income from which to support himself and make repayment.

Furthermore, from the very outset of the use of his cards, Mr. Kell was clearly insolvent. His Chapter 13 Statement indicates he had debts of $35,645.00 against assets of $9,330.00. Moreover, those stated assets include a leased vehicle valued at $7,000.00 which was not an asset in reality. Hence, at the time Mr. Kell entered into his agreement with the Bank, he was not just insolvent, he was hopelessly so.

It is obvious that Mr. Kell was well aware of his circumstances, for in his October 4, 1979 letter to the Bank, he indicated all his assets had been awarded to his ex–wife and he was "broke". Additionally, in his return of his original Mastercharge card on October 9, 1979, there must be implicit a recognition he was unable to sustain the required responsibilities. Indeed, he admitted as much in his letter of October 4.

Moreover, he must have been aware that the only means he had to repay the Bank was his income. Yet, despite the fact that income was charged with the burden of Chapter 13 payments, and despite the fact that it was obviously insufficient to meet his other needs, Mr. Kell continued to use his Mastercharge and Visa cards to acquire obligations which pushed his debt even further beyond his ability to pay.[8]

8. In the use of these credit cards, Mr. Kell exceeded his credit limit on both cards by 20 percent. While he attempts to negate the implications which arise out of this conduct by showing he made a payment each month that would have been sufficient to reduce his balance below his credit limit, he fails to mention the payment would have achieved that end

In my judgment, if Mr. Kell's conduct is viewed in its entirety, it is clear that he entered into the relationship with the Bank with full knowledge that his financial condition was extremely precarious and that he was without any financial resources other than his salary. It is equally clear that after his mother became ill and that tragedy caused an enormous drain on his income, Mr. Kell continued to make purchases of goods and services (many of which would appear to have been frivolous) in spite of that drain.

Again, Mr. Kell testified he always thought he would be able to repay, and thus he continued to use his cards. Yet, in light of the circumstances, that thought was clearly unrealistic. In fact, if such a thought had been entertained, it had to be a reckless disregard for reality.

Even assuming some justification for the sizable drain the illness of Mr. Kell's mother caused to his income, there is no evident justification for the remaining unexplained debts acquired while Mr. Kell was protected by the Chapter 13 stay. It is thus obvious that Mr. Kell was simply living far beyond his means. Given his sophistication, age, and intelligence, it would belie credence to assume he was ignorant of that fact.

In light of that knowledge and the other circumstances of this case already related, I am convinced the debt owed the Bank here falls within the exceptions to discharge provided in 11 U.S.C. § 523(a)(2)(A).

In arriving at this conclusion, I am aware that no evidence exists that establishes an overt false pretense on the part of the Defendant. Yet, inherent in his continued used of his credit cards without a disclosure of his insolvency when he was manifestly unable to repay the Bank in full, is a circumstance from which an intent not to pay may be inferred. As stated in Collier on Bankruptcy, 15th Ed. ¶ 523.08:

> To require an overt misrepresentation where hopeless insolvency makes payment impossible, is an unduly restricted interpretation of the purposes of the Bankruptcy Code.

Moreover, credit card purchases made with an intent not to repay constitute debts which are not dischargeable. In re Black, 373 F.Supp. 105 (E.D.Wis.1974); Lincoln First Bank v. D'Amico, 1 B.R. 170 (Bkrtcy. W.D.N.Y.1979).

The Defendant relies upon In re Parker, 1 B.R. 176 (Bkrtcy.E.D.Tenn.1979); however, the case is easily distinguishable and hence inapposite. In Parker, the court determined that a credit card holder who exceeds the card's credit limit does not create a nondischargeable debt by simply making charges beyond his credit limit. Because the debtor was unaware the limit had been exceeded, the Court was unable to find fraud in the debtor's acts. Those are not the circumstances here.

In contrast, the instant case is more like In re Black, supra. In that case, credit card purchases were made while the debtors were in a position of hopeless insolvency. The court observed that because of their insolvency, they could have had "no realistic intention of paying * * *". The Court stated:

> Each time they presented their credit cards and signatures for the purchases in question, the Blacks impliedly represented to [the creditor] that they had the wherewithall, as well as the intention, to pay for them.

> * * * * * *

> The Blacks' active purchasing conduct and symbolic representations involved in the use of their credit card constituted a form of fraud on [the creditor]. 373 F.Supp. at 107.

Of a like conclusion is the older case of California Conserving Co. v. D'Avanzo, 62 F.2d 528 (2nd Cir., 1933).

Another factor that adds a dimension to this case is the clear evidence of the Defendant's knowledge of his condition contained in his October 4 letter to the Bank in

---

only had he not continued to use his cards. Since that use continued despite what must have been certain knowledge that such use

would once again put him beyond the credit limit, his attempt at justification rings hollow.

which he stated his assets were gone and he was "broke". Upon very similar facts in *Bache Halsey Stuart Shields, Inc. v. Greenwald*, 2 B.R. 35 (Bkrtcy.S.D.Fla.1979), the court concluded the debtor knew he could not pay for credit purchases, and the debt created by making them was not dischargeable. I believe the same result must obtain here without question, and the debt owed by the Defendant to the United Bank of Denver must be adjudged excepted from discharge. Judgment shall be entered accordingly.