In re Patricia Ann SCLATER and
Slenderalla Mini Spa of Saginaw,
Inc., Debtor.

Frank J. KELLEY, Attorney General of
the State of Michigan, Plaintiff,

v.

In re Patricia Ann SCLATER and
Slenderalla Mini Spa of Saginaw,
Inc., Defendants.

Bankruptcy No. 82–0015.
Adv. No. 82–0342.

United States Bankruptcy Court,
E.D. Michigan, S.D.
at Flint.

March 22, 1984.

Marc A. Goldman, Asst. Atty. Gen. Consumer Protection Div., Lansing, Mich., for plaintiff.

Bruce E. St. John, Flint, Mich., for defendant/debtor.

## MEMORANDUM OPINION

STANLEY B. BERNSTEIN, Bankruptcy Judge.

ISSUE: ARE CLAIMS FOR THE UNUSED PORTIONS OF PRE–PAID MEMBERSHIP FEES TO A HEALTH SPA NONDISCHARGEABLE IN THE PRINCIPAL'S CHAPTER 7 CASE?

I. *Introduction and Determination of Preliminary Procedural Issues:*

A. *Factual Bankground:*

The debtor, Patricia Ann Sclater, is the President, chief operating officer and sole shareholder of Slenderalla Mini Spa of Saginaw, Inc., (spa) also a debtor in this Court. Ms. Sclater operated the spa from June, 1980, until November 6, 1981; Ms. Sclater and her corporation filed Chapter 7 bankruptcy petitions on January 13, 1982. The Michigan Attorney General filed a complaint against the corporate and individual debtors, seeking a determination that claims for the unused portion of prepaid membership fees to the insolvent health spa, formed as a Michigan corporation, are nondischargeable in the Chapter 7 bankruptcy case of its sole shareholder and chief operating officer.

The Attorney General sought to pierce the corporate veil and have Ms. Sclater held liable for fraud; that determination of fraud would then render the individual's liability nondischargeable. In framing the issue of fraud, the Attorney General relied upon the provisions of the Michigan Consumer Protection Act, M.C.L.A. § 445.901 *et seq.*, which prohibits various deceptive trade practices. The Attorney General attempted to tie violations of the Consumer

Protection Act to 11 U.S.C. § 523(a)(2)(A) in order to except from discharge claims which arose by the principal's obtaining money under false representations or false pretenses.

At trial, the Attorney General called as his witnesses the former manager of the Saginaw spa, Dolores Willumson, and Ms. Sclater as an adverse witness. Extensive trial and post-trial briefs were submitted by each party.

## B. *Standing*

The Court raised the issue of the Attorney General's standing to bring this action when the State of Michigan does not purport to be a creditor of either estate. 11 U.S.C. § 523(c) states that a "debtor shall be discharged from a debt specified in [§ 523(a)(2)(A), unless, on request of the creditor to whom such debt is owed, ... the court determines such debt to be excepted from discharge..."

The parties, upon request of the Court, have submitted extensive supplemental briefs on the standing issue. The Court has determined that two distinct grounds exist for the Attorney General's standing to bring this proceeding as *"parens patriae"* or as a class representative:

### 1) *Parens Patriae*

■■ *Parens patriae* literally means "parent of the country," but its traditional legal use refers to the role of the state as guardian of persons under a legal disability. *Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez,* 458 U.S. 592, 600 n. 8, 102 S.Ct. 3260, 3265 n. 8, 73 L.Ed.2d 995, 1003 n. 8 (1982).

■ Under the doctrine of *parens patriae,* the state may act on behalf of its citizens if the state's sovereign or quasi-sovereign interests are implicated. The Supreme Court in *Snapp* analyzed quasi-sovereign interests in detail:

> Quasi-sovereign interests stand apart ... [t]hey are not sovereign interests, proprietory interests or private interests

pursued by the state as a nominal party. They consist of a set of interests that the state has in the well-being of its populace ... A quasi-sovereign interest must be sufficiently concrete to create an actual controversy between the state and the defendant. The vagueness of this concept can only be filled in by turning to individual cases.

*Id.* at 601, 102 S.Ct. at 3266, 73 L.Ed.2d at 1004.

After summarizing the precedents, the Court stated:

> One helpful indicia [sic] in determining whether an alleged injury to the health and welfare of its citizens suffices to give the state standing to sue as *parens patriae* is whether the injury is one that the state, if it could, would likely attempt to address through its sovereign law-making powers.

*Id.* at 607–08, 102 S.Ct. at 3269, 73 L.Ed.2d at 1007–08. In *Snapp,* the Court determined that a state's decision regarding the extent of its participation in the federal system created standing under *parens patriae* to ensure that its citizens are not excluded from the benefits flowing from participation in the federal system. *Snapp* was a suit by the Commonwealth of Puerto Rico against produce growers alleging violations of legislation intended to assure job opportunities to U.S. citizens over those of foreign laborers. The applicability of the *Snapp* rationale is even stronger in this proceeding because the Michigan legislature *has acted* to prevent a class of injuries to the welfare of its citizens by enacting the Consumer Protection Act.

Enforcement of Michigan's Consumer Protection Act in the federal courts by the Attorney General has precedent. In *Kelley v. Carr,* 442 F.Supp. 346 (W.D.Mich.1977), the court allowed the Michigan Attorney General to bring suit for an injunction against a commodities broker; the suit was based on the Michigan Consumer Protection Act and the federal Commodity Exchange Act.[1] In finding that the Attorney

---

1. The Attorney General's original action under the Consumer Protection Act had been com-

General had standing under the *parens patriae* doctrine, the court stated that included among a state's quasi-sovereign interests is the "protection of its citizens from fraudulent and deceptive practices, support for the general welfare of its residents and its economy, and prevention of its citizens' revenue from being wrongfully extracted from the state." *Id.* at 356–57.

■ In this proceeding, the Attorney General alleged that Ms. Sclater deceitfully induced consumers to buy memberships in the spa when the company was insolvent. Because she knew or should have known of her company's inability to provide the prepaid services, the continued sale of memberships constituted a fraudulent or deceptive trade practice expressly prohibited by the Consumer Protection Act, M.C.L.A. 445.903(1)(g). The Attorney General is thus seeking to protect Michigan residents from fraudulent and deceptive practices under a mandate from the state legislature addressing this specific type of injury. The use of the *parens patriae* doctrine to establish the Attorney General's standing in this proceeding is in direct conformity with the *Snapp* and *Kelley* guidelines.[2]

### 2) *Class Representative*

■ The Attorney General also has standing as a class representative of the members of the spa. Although the complaint did not seek certification of a class, the Attorney General did seek the issuance of "an order requiring defendants to reimburse those persons who contracted for membership with defendant Slenderalla Mini Spa of Saginaw, Inc., for the unused portion of the prepaid membership fees."

The relief sought is in conformity with the Attorney General's statutory authority to bring class actions and act as the class representative under the Michigan Consumer Protection Act:

> The Attorney General may bring a class action on behalf of persons residing in or injured in this state for the actual damages caused by any of the following: (a) A method, act, or practice in trade or commerce defined as unlawful under [M.C.L.A. § 445.903]."

M.C.L.A. § 445.910.

■ After the proofs were closed, the Attorney General filed a Motion to Amend the Complaint to Conform to the Evidence. In the Motion, he argued for having the complaint treated as a class action. From the onset of this proceeding, the Attorney General has acted as a representative of the consumer class of individual members of the spa, and as their representative, has sought recoveries for each member of the class. Although formal class certification did not occur prior to trial, the defendants have not shown that certification after trial would be prejudicial. Federal Rule of Civil Procedure 15(b) states:

> (b) Amendments to Conform to the Evidence. When issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings. Such amendment of the pleadings as may be necessary to cause them to conform to the evidence and to raise these issues may be made upon motion of any party at any time, even after judgment; but failure so to amend does not affect the result of

menced in state court. After removal to federal district court, the complaint was amended to add allegations under the Commodity Exchange Act.

**2.** The defendants contend that the reference to "creditor" contained in § 523(c) precludes this action by the Attorney General where the state does not allege creditor status and cites *In re Pierson,* 17 B.R. 822 (Bankr.D.Minn.1982) in support. A careful reading of *Pierson* reveals that it is both distinguishable and should be limited to its facts. The state's complaint there

was based on criminal charges which had been filed, but not yet tried, against the debtor. The state sought to have any future recoveries, obtained as restitution in the pending criminal proceedings, determined nondischargeable. The court held that the state's action was premature, and that the state was not a "creditor" in the bankruptcy sense. *Pierson* dealt only with debts, not yet determined, arising out of criminal offenses. The state did not attempt to establish its standing to bring an action against the debtor under the *parens patriae* doctrine.

the trial of these issues. If evidence is objected to at the trial on the ground that it is not within the issues made by the pleadings, the court may allow the pleadings to be amended and shall do so freely when the presentation of the merits of the action will be subserved thereby and the objecting party fails to satisfy the court that the admission of such evidence would prejudice him in maintaining his action or defense upon the merits. The court may grant a continuance to enable the objecting party to meet such evidence.

The procedural confusion in this case seems to have arisen, at least in part, because the Consumer Protection Act anticipates that actions for its enforcement will be filed in state court. Indeed, the Attorney General could have filed his complaint under the Act against Ms. Sclater and the spa even after their bankruptcy petitions have been filed. The automatic stay would not have been effective to enjoin the litigation at least through the judgment stage because the state would have been enforcing the exercise of its police and regulatory powers, an exception to the stay under 11 U.S.C. § 362(b)(4).

This Court, however, has exclusive jurisdiction over determinations of nondischargeability for obtaining monies by false pretenses or representations under 11 U.S.C. § 523(a)(2)(A). *See* 11 U.S.C. § 523(c). Thus, the Attorney General would have had to come to this Court for a determination of nondischargeability against Ms. Sclater after having proven the validity of his claim for damages in state court. By proceeding in this Court, the Attorney General, in effect, collapsed two phases of the litigation into one adversary proceeding—proving the claim and determining its nondischargeability.

The Attorney General's complaint before this Court is not barred by the Federal Rules regarding class actions. Rule 23 of the Federal Rules of Civil Procedure states:

(a) Prerequisites to a Class Action. One or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or, defense of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

(b) Class Actions Maintainable. An action may be maintained as a class action if the prerequisites of subdivision (a) are satisfied, and in addition:

(1) the prosecution of separate actions by or against individual members of the class would create a risk of

(A) inconsistent or varying adjudications with respect to individual members of the class which would establish incompatible standards of conduct for the party opposing the class, or

(B) adjudications with respect to individual members of the class which would as a practical matter be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests; or

(2) the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole; or

(3) the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy. The matters pertinent to the findings include: (A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; (D)

the difficulties likely to be encountered in the management of a class action.

Although a literal reading of this rule would indicate that an attorney general cannot qualify as the class representative, the courts have not interpreted the rule so narrowly. Attorneys general have been held to be proper class representatives. The reported cases in this area present little or no analysis. For example, in *Philadelphia v. American Oil Co.*, 53 F.R.D. 45 (D.N.J.1971), the court wrote an exhaustive opinion concerning the complicated issues that arise in class actions suits. With respect to the state attorney general's ability to act as the class representative, the court simply stated, "the state attorney general, or his duly authorized agent, can represent all the consumers within his given state in a Rule 23(b)(3) action," citing as authority *In re Coordinated Pretrial Proceedings in Antibiotic Antitrust Actions (Consumer Class Actions)*, 333 F.Supp. 278 (S.D.N.Y.1971), 53 F.R.D. at 67. Similarly, in an action brought under the Securities and Exchange Act to recover for alleged nondisclosures in a stock sale, the court held, without any elaboration, "[t]here is no reason, as a matter of federal law, why class suits may not be pressed by state attorneys general; reported cases illustrate the point." *State Teachers Retirement Board v. Fluor Corp.*, 73 F.R.D. 569, 572 (S.D.N.Y.1976). The court then cites as support *Illinois v. Brunswick*, 32 F.R.D. 453 (D.Ill.1963); *Minnesota v. United States Steel Corp.*, 44 F.R.D. 559 (D.Minn.1968); *Illinois v. Harper & Row Publishers, Inc.*, 301 F.Supp. 484 (N.D.Ill. 1969).

With respect to the issue surrounding class actions, the Court finds that the parties treated this proceeding as a class action in all material respects at the time of trial. The Court further finds that this action is properly pursued under Fed.R.Civ. Pro. 23(b)(3). The Court therefore grants the Attorney General's Motion to Amend the Complaint to conform to the evidence.[3]

## C. *Certification of Class*

 Federal class actions must satisfy two separate sets of criteria for certification under Rule 23. The requirements of Rule 23(a) are met here in that uncontroverted testimony proved that approximately 390 memberships were sold during the time in which the spa was insolvent; joinder of so many small claims would be clearly impracticable. The questions of law and fact surrounding those claims are virtually identical. The status of the representative, as discussed previously, is a statutory one, and the Court is satisfied that the representative has not only fairly and adequately protected the interest of the class, but the Attorney General's conduct during the course of these proceedings shows that the representative has vigorously pursued the interests of that class.

The requirements of Fed.R.Civ.Pro. 23(b)(3) are also easily met. The legal and factual issues raised by the class members are identical; thus, there is little likelihood that an individual's situation would predominate. A class action is a superior method for the adjudication of this matter, both because of the consumer nature of the action—numerous claims consisting of relatively small amounts of money owed to each claimant—and the existence of the spa's bankruptcy; pursuit of these claims on an individual basis against the debtor would have been a significant drain on the estate and protract its administration. Because the spa and Ms. Sclater did file for relief under the Bankruptcy Code, this Court is clearly the proper forum for resolution of the dispute. Although the Attor-

---

**3.** There is precedent in treating a case as a class action which was not originally filed as such. In *Hill v. Ozar (In re Wholesale Furniture Mart, Inc.)*, 24 B.R. 240 (Bankr.W.D.Mo.1982), two individual consumers brought a conversion action against the debtor retailer for merchandise for which they had paid but never received. Judge Stewart stated "[t]he court of bankruptcy has treated the action thus initiated as a class action in favor of all customers who had paid the Chapter 11 debtor for merchandise which they did not receive." *Id.* at 241. It appears in the case that the class determination in *Hill* was made by the court *sua sponte,* and that the plaintiffs refused to be active class representatives. Regardless of those problems, the class was certified and a judgment against the debtor's principal was entered.

ney General or the spa members could have initially litigated the validity of the fraud claim in state court, this also would have seriously delayed the administration of the bankruptcy.

In *Alexander v. Aero Lodge No. 735, International Association of Machinists & Aerospace Workers*, 565 F.2d 1364 (6th Cir.1977), the Sixth Circuit held that it was not improper for the trial court to certify a matter as a class action until after a decision on the merits. *Alexander* involved an employment discrimination action filed against both the employer and the union. Although the action was "brought" as a class action in that the pleadings stated that intent, none of the parties actively sought certification of the class until a few days before trial. Following trial, the district court issued a memorandum opinion on the merits; that decision included the certification of the class under Rule 23(b)(2). On review, the Sixth Circuit held that not only *must* a court enter an order determining the appropriateness of the class action, whether requested by the parties or not, but also:

> Notwithstanding our strongly expressed views on the desirability of an early determination of whether a class action will be maintained, our circuit has required a showing of actual prejudice to the protesting party, ... which we are unable to discover here.

*Id.* at 1372.

The court concluded that in light of the facts in *Alexander* and the nature of the lawsuit "it would be a miscarriage of justice to deny class relief on this basis [the time factor] if it is otherwise justified." *Id.*

The *Alexander* analysis is controlling. Although this proceeding was not formally filed as a class action, it was clear to the parties and this Court that the Attorney General sought a determination of nondischargeability of debts owed to a well-defined class of specific members of the spa and further that he sought disgorgement of the prepaid fees to those members. Certification of this matter as a class action at this time in no way prejudices the defendants because there can be no expansion in their potential liability.[4]

The Court will require that members of the class be given the opportunity to "opt out" if they so desire and they will be informed of this Court's decision on the merits. As such, there is no risk involved to the class members, especially since they will not only be informed of the result, but have been left without any remedy had it not been for the Attorney General's action; any claims they might have had were prepetition unsecured ones and thus, otherwise, would have been discharged.[5]

Therefore, this Court certifies as the appropriate class those individuals who purchased prepaid memberships from the spa on or after the date of its insolvency. The determination of that date will be discussed *infra*.

## II. Determination of Nondischargeability

### A. Insolvency of the Spa

■ The record in this proceeding shows that the spa was in a precarious financial

---

4. There, is dicta in the *Alexander* opinion suggesting that prejudgment notice is mandatory in (b)(3) types of class actions. This Court is not bound by such dicta; the authority cited was not Sixth Circuit law nor is such a conclusion expressed in Rule 23(c)(2):

> (2) In any class action maintained under subdivision (b)(3), the court shall direct to the members of the class the best notice practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort. The notice shall advise each member that (A) the court will exclude him from the class if he so requests by a specified date; (B) the judgment, whether favorable or not, will include all members who do not request exclusion; and (C) any member who does not request exclusion may, if he desires, enter an appearance through his counsel.

Although it is clear that the rule anticipates certification and notice prior to judgment, there is no compelling reason to apply that construction to this proceeding.

5. Very few, if any, of the former spa members filed claims in these bankruptcy proceedings, thus any argument that their claims are entitled to priority treatment under 11 U.S.C. § 507(a)(5) is an insignificant one.

situation almost from its inception. The 1979 and 1980 personal property taxes were never paid. On December 30, 1980, Ms. Sclater was notified that the insurance on the spa was being cancelled because the premiums were six months in arrears. In January, 1981, Ms. Sclater arranged to purchase equipment for the spa for a price of $25,000; by July of that year only one payment (in the amount of $500) had been made. Lease payments on the spa's premises had been so sporadic that in February, 1981 the lessor began demanding weekly instead of monthly payments. In that same month Ms. Sclater was 90 days in arrears to the *Saginaw News* for advertising costs.

In March, 1981, the individual debtor was sued for $32,000 by McMaster Builders and her check for the lease payment was returned for insufficient funds. Between June 1 and August 14, 1981, fifteen checks totalling $3,369.33 were dishonored for insufficient funds. Ms. Sclater's account with her accountants, with a balance of $6,893.65, was turned over to attorneys for collection on June 11, 1981. By August, 1981, Ms. Sclater's request for a small business loan was denied because of her outstanding delinquent payments on existing loans and she received a warning on potential foreclosure of the second mortage on her house. The following month she received a notice from the bank concerning her insurance cancellation and warning her about potential legal action resulting from loan payment arrearages.

This Court is not convinced that the Slenderalla Mini Spa was ever solvent, but if it ever were, it was clearly insolvent by July 1, 1981. By July, the corporation was in default to the county for property taxes, the landlord for the spa, the newspaper for advertising, and its accountants; it had been sued for nonpayment by one creditor and had its checks dishonored on a regular basis. The July, 1981 checking account statement reflected a negative balance.

## B. *Fraud*

Between July 1, 1981 and November 6, 1981 when the spa ceased operations, the spa had sold 390 memberships for a total of $23,870.05. The evidence at trial proved that membership fees provided the spa's only source of income. Accompanying the sale of those memberships was the implied representation that the spa intended to and had the financial ability to provide the benefits of membership throughout the term of the agreements. As such, the continued sale of memberships from July 1, 1981 to 48 hours before ceasing operations constituted fraudulent acts or misrepresentations. By continuing to sell memberships after it was insolvent, the spa falsely represented to membership purchasers its ability to honor its contract with them; such misrepresentation constitutes fraud within the meaning of § 523(a)(2)(A).

## C. *Liability of Shareholder*

The members of the class are not limited to recovery against the corporation. The law has traditionally allowed injured parties to "pierce the corporate veil" where the corporation is a sham or a mere instrumentality of its shareholders. The Attorney General seeks to have the spa's sole shareholder and chief operating officer, Ms. Sclater, held individually liable to those persons who purchased memberships during the time of the spa's insolvency; he also seeks to have that individual liability held to be nondischargeable.

In *Kline v. Kline*, 104 Mich.App. 700, 305 N.W.2d 297 (1981), the wife in a divorce action attempted to recover money owed her from the property settlement from her dentist-husband's professional corporation. A professional corporation, like a close corporation, involves a minimal number of shareholders. With respect to disregarding the corporate entity, the Michigan Court of Appeals stated:

> Generally, the law treats a corporation as an entirely separate entity from its stockholders, even where one person owns all of the corporation's stock. Complete identity of interest between sole shareholder and corporation may lead courts to treat them as one for certain pur-

poses. Where the corporation is a mere agent or instrumentality of its shareholders or a device to avoid legal obligations, the corporate entity may be ignored. A court may look through the veil of corporate structure to avoid fraud or injustice. The community of interest between corporation and shareholder may be so great that, to meet the purposes of justice, they should be considered as one and the same. When the notion of a corporation as a legal entity is used to defeat public convenience, justify a wrong, protect fraud or defend crime, that notion must be set aside and the corporation treated as the individuals who own it.

*Id.* at 702–03, 305 N.W.2d 297 (citations omitted).

The record in this proceeding shows that Ms. Sclater ignored all of the corporate formalities. There was no board of directors, no annual meetings, and no corporate minutes. Numerous checks were written for "cash" from the corporation's account for which there is no indication that the money was used for corporate purposes. It is clear that Ms. Sclater operated the spa as her personal instrumentality and alter ego and thus is personally liable to the members of the class.

### D. *Recklessness*

Ms. Sclater's individual liability is nondischargeable. It is no defense that Ms. Sclater did not *intend* to misrepresent the spa's viability to its customers; the scienter requirement may be proven by a showing of a reckless disregard of the truth in § 523(a)(2) actions. The applicability of the reckless disregard standard was upheld and well analyzed in *Houtman v. Mann (In re Houtman),* 568 F.2d 651 (9th Cir. 1978). In *Houtman,* the court of appeals upheld the bankruptcy court's determination of nondischargeability based upon a state court fraud judgment. The Ninth Circuit reasoned that to require a showing of actual intent would nullify the difference between exceptions to discharge (§ 523) and exemptions from discharge (§ 727). In

addition, the court pointed out that in the tort of misrepresentation, the scienter requirement generally has been interpreted to include recklessness.

Not only is recklessness sufficient scienter for a finding of misrepresentation, but a debtor's irresponsibility in failing to appreciate his or her financial limitations constitutes such reckless disregard.

[The debtor] was accumulating debt greater than his ability to pay ... [I]t is clear he did not have sufficient income from which to support himself and make repayment. Furthermore, from the very onset of the use of his cards, Mr. Kell was clearly insolvent.

\* \* \* \* \* \*

Moreover, he must have been aware that the only means he had to repay the bank was his income.

*United Bank of Denver v. Kell (In re Kell),* 6 B.R. 695, 698 (Bankr.D.Colo.1980). In *Kell,* the debtor had been asked to turn in his bank credit cards because of nonpayment. Within two weeks of complying with that request, the debtor reapplied for cards; that reapplication did not disclose the current arrearage owed the bank. Prior to bank action on the application, Mr. Kell filed a Chapter 13 petition. Unaware of the bankruptcy because they were not listed on the schedules, the bank issued new credit cards to the debtor. Mr. Kell then incurred $2,500.00 in further indebtedness through the use of those cards.

In the present proceedings, Ms. Sclater knew by July 1, 1981 that she was in default on her lease, payments on the equipment purchase, payments to the newspaper and accountants. She had been sued for a sizeable sum, her insurance had been cancelled, and the business' checks were dishonored on a regular basis.

Controlling stockholders cannot engage in the self-delusion that as long as prepaid service contracts are sold, even on a severely discounted basis, that the business will weather an adverse economic climate. Nor is it an excuse from liability that a controlling person has exhausted her per-

sonal resources, including loans and advances from life-long friends. The debtor's acts of desperation may be personally tragic, but that does not excuse liability to members of the general public who were induced to "invest" in an insolvent business by false representations. Such self-delusion can be and must be described as reckless disregard of economic reality when the consumer is adversely affected. The legal consequence of reckless disregard is a determination of nondischargeability of debts caused by such disregard.

This Court thus finds that the sale of all memberships between July 1, 1981 and November 6, 1981 were the result of fraudulent misrepresentations by Patricia Ann Sclater and will be held as allowed claims against the corporation and Ms. Sclater in an amount to be determined. This Court further finds that Ms. Sclater is individually liable for those fraudulent representations and thus those claims are nondischargeable under 11 U.S.C. § 523(a)(2)(A).

A separate judgment has been entered consistent with this opinion.