In the Matter of Alfred Anthony CURCIO, Bankrupt.

MANUFACTURERS NATIONAL BANK OF DETROIT, a National Banking Association, Plaintiff,

v.

Alfred Anthony CURCIO, Defendant.

Bankruptcy No. 79–91147–B.

United States Bankruptcy Court, E. D. Michigan.

Dec. 27, 1979.

Christian C. Nilson, Michael R. Main, and Michael D. Boutell by Christian C. Nilson, Detroit, Mich., for plaintiff.

UAW Legal Services Plan by Charles M. Gayney, Detroit, Mich., for defendant.

OPINION

GEORGE BRODY, Bankruptcy Judge.

This is an action instituted by Manufacturers National Bank of Detroit to except from discharge a debt owing to it in the amount of $811.82. The facts are not in dispute and are as follows:

Manufacturers National Bank of Detroit (hereinafter referred to as the "Bank") issued a Master Charge credit card to Alfred Anthony Curcio (hereinafter referred to as the "bankrupt") on May 1, 1972, with an established credit limit of $500.00. Pursuant to the Master Charge agreement, the bankrupt agreed not to exceed the credit limit established on his account. This limit was increased unilaterally by the Bank to $700.00 in November of 1974; to $900.00 in November of 1975; to $1,100.00 in November of 1976, and finally to $1,400.00 in November of 1978. The bankrupt first exceeded his credit limit, as shown in the statement for the billing period ending October 9, 1978, by $1.78. The bankrupt did not receive notice from the Bank regarding this over-extension. The following month the bankrupt exceeded his credit limit with additional charges. He was notified by the Bank in the statement for the billing period ending November 9, 1978 that his account was past due and that he had exceeded his credit limit. The bankrupt continued to make additional charge purchases. Statements that he received from the Bank for the billing periods ending January 9 and February 9, reflected the additional charges, and again informed the bankrupt that he exceeded his charge limit. These statements also indicated the interest charges incurred, the total debt then outstanding and called for a minimum payment—a payment apparently computed as a specified percentage of the outstanding indebtedness but without any relationship to the amounts by which the bankrupt had exceeded his charge limit. None of the statements demanded that the bankrupt return the credit card or directed him to discontinue incurring additional charges until his account was brought within his charge limit. The Bank, however, by letters dated January 22, February 7, and March 6 of 1979, notified the bankrupt that his Master Charge credit privileges were revoked and requested that he return his credit card to the Bank. As of January 22, 1979, the bankrupt had exceeded his authorized charge limit by $712.96. The bankrupt failed to return his credit card and incurred additional charges of $45.58.

On April 8, 1979, Mr. Curcio filed a petition in bankruptcy. The Bank, thereupon, instituted this action to except from discharge all charges incurred by the bankrupt in excess of $1,400.00. It is the contention of the Bank that the bankrupt, when he incurred charges in excess of his credit limit of $1,400.00, obtained property by "false pretenses or false representations" within the meaning of Section 17a(2) of the Bankruptcy Act of 1898, as amended. Section 17a(2), in pertinent part, excepts from discharge

"liabilities for obtaining money or property by false pretenses or false representations."

▋ In making a credit card purchase, the holder of a charge card represents that he is a valid holder of the card and that the purchase is being made in compliance with the conditions subject to which the card was issued. Purchases made by a credit cardholder in excess of the stated credit limit, therefore, constitute obtaining money or property by false representations within the meaning of Section 17a(2), unless the credit card issuer has consented to, or acquiesced in purchases in excess of that limit.

"If a cardholder, in violation of his express agreement of purchase limitation, and without subsequent acquiescence on the part of the credit issuer, appropriates to his own use the credit of another, namely the Bank, by knowingly placing the Bank in a position where it must accept an invoice, there is then what could in appropriate circumstances amount to the willful and malicious conversion of the property of another. The property converted—the Bank's line of credit. The Bank becomes an involuntary creditor of the bankrupt as the result of the bankrupt's willful acts." *In re Whitehead*, 2 B.C.D. 1647, 1650 (1976).

▋ Upon the record before me, I find that the Bank has waived its right to rely upon the bankrupt's agreement not to exceed his established credit limit as a ground for non-dischargeability, except for charges

incurred by him after he received notice that the Bank had revoked his credit privileges.

The Bank unilaterally increased the bankrupt's initial charge limit from $500.00 in 1974 to $1,400.00 in 1978. None of the billing statements received by the bankrupt, after he incurred charges in excess of the then existing limit, informed him that he had to reduce the amount owing below his charge limit as a condition for making additional purchases. It was not until January 22, 1979, when the bankrupt had exceeded his limit by $712.96, that the bank first informed him that his credit privileges were revoked and requested him to return his credit card. The Bank apparently did not consider until January 22, the charge limit as a material condition to the continued use of the credit card. In fact, the conclusion is inescapable that "the Bank seemed more than willing to permit the charge to continue, with additions of the high finance charges typical in such transactions." *Winters National Bank and Trust Company v. Gibson*, 1 B.C.D. 449, 450.[1]

█ The issuer of a credit card must make a choice. If it intends to rely upon an agreed charge limit, it must advise the holder of the card, who exceeds the limit, that he is not to continue to incur additional charges until he has made payments to get under his charge limit. If the Bank does not do so, it in effect waives the right to contend that charges incurred in excess of the stated limit constitute obtaining property by false representation or false pretenses.

The Bank's reliance upon *In re Cushingberry*, 5 B.C.D. 954 (1979), is misplaced. The court in *Cushingberry* did hold, as the Bank asserts, that a charge cardholder, when making a credit purchase represents that he is the rightful holder of the card

and that the purchase is being made in compliance with the conditions subject to which the card was issued, and therefore that purchases made by a debtor in excess of his approved credit limit constituted obtaining property by false representation within the meaning of Section 17a(2). However, the conclusion that the debt representing charges in excess of a stated limit were non-dischargeable was based upon the court's finding that

" . . . the bank did not expressly or by implication ratify the bankrupt's use of the card in violation of the charge limit established." *Cushingberry*, supra, at p. 955.

The bank in *Cushingberry* promptly notified the debtor that he had exceeded his limit and made prompt and diligent efforts to revoke the card. This was not the case here.

---

1. The following quote attributed to David Auriemma, Vice President of New York's Chemical Bank, appearing in the December 3, 1979 issue of the Detroit Free Press, apparently concedes that banks issuing credit cards prefer borrowers who do not pay in full, but who keep outstanding balances so that the bank may earn interest on the unpaid balance.

"In the credit card business, I would prefer someone who allows his balance to roll-over. The convenience user (who pays in full each month) is borrowing my money for no interest. . . ."