**In re Alton Bertrand VICTORIAN, Bankrupt.**

**OHIO CITIZENS TRUST COMPANY, Plaintiff,**

v.

**Alton Bertrand VICTORIAN, Defendant.**

**Bankruptcy No. B79–1235.**

United States Bankruptcy Court, N. D. Ohio, W. D.

Jan. 14, 1981.

Barry E. Savage, Savage & Lindsley Co., L. P. A., Toledo, Ohio, for plaintiff.

Lorin J. Zaner, Toledo, Ohio, for defendant.

## MEMORANDUM OPINION AND ORDER

RICHARD L. SPEER, Bankruptcy Judge.

This matter came under the Court's consideration upon the Complaint of Ohio Citizens Trust Company To Determine Dischargeability of the debt of the Bankrupt to the Plaintiff Bank, pursuant to Section 17(a)(2) of the Bankruptcy Act. Section 17 describes debts not affected by a discharge in bankruptcy, specifically:

" * * * liabilities for obtaining money or property by false pretenses or false representations, or for obtaining money or property on credit or obtaining an extension or renewal of credit in reliance upon a materially false statement in writing respecting his financial condition made or published or caused to be made or published in any manner whatsoever with intent to deceive, or for willful and malicious conversion of the property of another."

Plaintiff urges the Court to find that the Bankrupt obtained property on credit by false pretenses and prays for a determination that the debt of the Bankrupt to the Plaintiff in the amount of $5,380.20 plus interest be found nondischargeable, and for costs and attorney's fees.

## STATEMENT OF FACTS

On August 25, 1978, Plaintiff received from the Bankrupt an application for a VISA card. A line of credit was established with a $500.00 limit, and a card was issued to the Bankrupt. The card and application carried only one authorized signature, that of the Bankrupt.

The Bankrupt was fifty years old at the time of application for the VISA card; he has a third grade education and is seasonally employed by the Toledo Overseas Terminal. The Bankrupt has been divorced for several years and has five grown children. By all appearances the Bankrupt is unworldly and has some difficulty expressing himself. Unable to complete the VISA application by himself, the Bankrupt testified that his niece helped him.

The Bankrupt became acquainted with Michelle Wiley, an eighteen year old girl, sometime during 1977. Five days after they met the Bankrupt gave Michelle a diamond ring. About this time he also co-signed for Michelle Wiley on a note for the purchase of a new car, and later gave her a fur coat and bought or co-signed for new furniture for her. These debts were listed in the Bankruptcy Petition. It was stated by the Bankrupt and by Michelle Wiley that the two were engaged to be married. Michelle broke the engagement sometime later, but continued to see the Bankrupt from time to time at grocery and drug stores, or at the Bankrupt's place of employment. The Bankrupt gave Michelle Wiley money on different occasions and bought things for her periodically.

Sometime in November of 1978, Michelle obtained the Bankrupt's VISA card. The Bankrupt testified that they went during his lunch hour to a gas station to buy gas which the Bankrupt had offered to pay for with the VISA card. Apparently the Bankrupt gave Michelle the card to give to the attendant, and Michelle did not give the card back to the Bankrupt. The Bankrupt testified that Michelle threatened to scream if he took the card back; Michelle testified that he gave her the card and told her to go on a shopping spree. Whatever the conflict

may be in the testimony regarding how Michelle obtained the card, the evidence clearly indicates that Michelle Wiley did indeed go on a shopping spree, and did not return the card to the Bankrupt for about a month and a half.

The Bankrupt testified that he called the Bank the day after Michelle "took" the VISA card. This testimony conflicts with the Bank records, admitted into evidence without objection, which indicate that the call from the Bankrupt was made on December 19, 1978. Further, charge receipts and billing statements admitted into evidence indicate that charges were made at women's clothing and cosmetic stores as early as November 19, 1978. Successive billing statements reveal a string of purchases at women's clothing stores in Columbus and Toledo, toy stores, restaurants, record stores, car washes, gas stations, auto parts stores, and department and drug stores. The following chart shows that the $500.00 credit limit was exceeded in November, 1978, and thereafter by substantial amounts:

| Statement Closing Date | Minimum Amount Due | Total Balance |
| --- | --- | --- |
| 11/28/78 | $ 31.98 | $ 531.98 |
| 12/21/78 | $2,986.98 | $3,486.98 |
| 1/26/79 | $4,552.06 | $5,052.06 |
| 2/26/79 | $4,556.08 | $5,056.08 |
| 3/28/79 | $4,610.10 | $5,110.10 |

■ To bring a credit card obligation within Section 17(a)(2), however, something more than exceeding the credit limit must be shown. *Davison-Paxon Co. v. Caldwell*, 115 F.2d 189 (5th Cir. 1940), *In re Houtman*, 568 F.2d 651 (9th Cir. 1978), *In re Black*, 373 F.Supp. 105 (E.D.Wis.1974), *In re Whitehead*, 2 BCD 1647 (Utah 1976), *In re Jordan*, 3 BCD 1292 (S.D.Ohio 1977), *In re Boydston*, 520 F.2d 1098 (5th Cir. 1975), *In re Wood*, 571 F.2d 284 (5th Cir. 1978).

The Bankrupt called the Bank on December 19, 1978 to inform them that his account would probably be over the limit and that his friend had taken the card and would not return it. The Bank employee handling the account advised the Bankrupt to come into the Bank and discuss the matter. The next day, December 20, 1978, the Bankrupt went to the Bank and was further advised to report the missing card to the police and to have a warrant issued on Michelle Wiley. The Bankrupt followed this advice and returned to the Bank that day to so inform the account agent. Notes of the account agent admitted into evidence indicate that the Bankrupt was told that he would not be held responsible for Michelle's abuse of the VISA card "and as long as warrant was out we could stand up in court with action taken."

Yet in the same day, the Bankrupt went again to the Bank and informed the agent that he had released the warrant. Still on the same day, according to the agent's notes, the Bankrupt returned to the Bank to inform them that he had received the card back from Michelle, and that he would pay the account off as soon as possible.

Michelle Wiley testified that she did not realize she had gone over the credit limit; she "got carried away." The Bankrupt testified that he found Michelle on December 20, 1978, told her that the police would be after her if she did not surrender the card, at which point she returned the card to the Bankrupt.

The Bankrupt attempted to obtain a loan from a consumer lender to pay off the VISA account but was unable to procure such a loan. His Petition in Bankruptcy was filed on September 21, 1979, approximately ten months after the shopping spree.

## DISCUSSION OF ISSUES

■ This Court has previously held that to meet the requirements of a nondischargeable debt under Section 17(a)(2) of the Bankruptcy Act, a creditor must prove:

1.) that the debtor made representations;

2.) that at the time he knew they were false;

3.) that he made them with the intent to deceive the creditor;

4.) that the creditor relied on the representations; and

5.) that the creditor's loss was the proximate result of the misrepresentations having been made.

The creditor must prove each of the five elements to prevail on his complaint. *In Re Hammond*, 5 OO3d 412 (1977).

"Credit card cases" in bankruptcy have been decided along two diverse lines of reasoning. One line of cases adheres to the reasoning of *Davison-Paxon*, supra, which held that the presentation of a credit card by a buyer for purchase of goods, without an overt expression of insolvency or intent not to pay, does not satisfy the requirement under Section 17(a)(2) of false pretenses or false representations. Other cases have found fraud within the purview of Section 17(a)(2) where hopeless insolvency gives rise to an implied representation of intent not to pay for merchandise obtained on creditor. *In re Black*, supra. Collier follows the view that the bankrupt who purchases goods on credit without intending to pay for them has made a false representation within the meaning of Section 17(a)(2). 1A Collier on Bankruptcy Section 17.16(3).

It is clear in either interpretation that fraudulent intent is required to bar the discharge of a debt under Section 17(a)(2) of the Bankruptcy Act. This Court finds that the better view is that which does not require an overt act of fraud to bring a debt within Section 17(a)(2).

The case now before the Court is distinguishable from other cases the Court has found or been referred to involving the abuse of credit cards. The evidence and testimony establish that it was a third party and not the *Bankrupt* who made the purchases with the card. The question then remains whether a finding of false representations made by Michelle Wiley can be imposed upon the Bankrupt so as to bring the debt within Section 17(a)(2). While the Court rejects the argument of the Plaintiff that the relationship between the Bankrupt and Michelle Wiley constituted an agency, the Court finds that the Bankrupt violated the express agreement with the Bank by permitting control of the card to be in the hands of someone other than himself. Although no representations were made directly to the Bank *in the purchase of the merchandise*, the Bank accepted the invoices from the various merchants in reliance upon its agreement with the Bankrupt that purchases were to be made by the authorized signature and none other.

Further, fraud may be committed by a suppression of the truth as well as by the expression of a falsehood. Nondisclosure of a material fact may constitute fraud where there is a duty, under the circumstances, to disclose such fact. 24 OJur2d Section 74,-676.

The Bankrupt concealed from the Bank the truth about the location of the VISA card when in fact he knew that Michelle Wiley still had the card in her possession. The Bankrupt testified that he notified the Bank that his card was "missing" the day after Michelle Wiley obtained the card. Based upon the evidence, the Court reiterates its finding that approximately one month passed before the Bank was so apprised. According to the closing billing dates, posting time considered, over $2,000.00 worth of merchandise was purchased with the VISA card by December 21, 1978. The Bank's agent's notes indicate that the Bankrupt told the agent that he had received the card back from Michelle Wiley on December 20 or 21, 1978, but billing statements reveal charges at women's clothing stores in Columbus and Toledo through the end of December and into January, 1979. The Bankrupt's concealment of the true whereabouts of the VISA card continued up to the time the Bankrupt actually turned the card over to the Bank sometime during the first ten days of January, 1979, at which time the card was cut and the account was turned over to the Bank's legal representative for collection against both the Bankrupt and Michelle Wiley.

While the Court finds utterly contemptible the actions of Michelle Wiley with respect to the Bankrupt and his property, unfortunate circumstances did not remove the duty of the Bankrupt to aid the Bank in

its efforts to control the Bankrupt's VISA account. In spite of his lack of economic sophistication, the Bankrupt's failure to notify the Bank immediately so that the Bank could have a block set up on the account (which can be done instantly by calling a toll-free number), his failure to give the Bank Michelle Wiley's address, as well as his failure to proceed with legal action in the form of a warrant, after being so advised by the Bank, constitute a degree of recklessness sufficient to satisfy the requirement of fraudulent intent on the part of the Bankrupt. *In re Houtman*, supra at 656.

That the Bankrupt's motive appears to have been to protect Michelle Wiley from liability is, unfortunately, of little or no help to the Bankrupt in the matter at hand. The acts of omission recited by the Court coupled with the Bankrupt's representation of the whereabouts of the card on December 20, 1978, limited the Bank's ability to block the account or to proceed against Michelle Wiley, and further led the Bank to believe that by December 20 or 21, 1978, the Bankrupt once again had control of the card. That the Bank's loss was the proximate result of these acts and misrepresentations is clear.

### CONCLUSION OF LAW

Based upon the foregoing, the Court finds that the Plaintiff has proved each element of the cause of action under Section 17(a)(2), and shall prevail on the Complaint. It is therefore

**ORDERED ADJUDGED AND DECREED** that the obligation of the Defendant-Bankrupt to Ohio Citizens Trust Company is a nondischargeable debt in bankruptcy pursuant to Section 17(a)(2) of the Bankruptcy Act in the amount shown on the last billing statement, $5,110.10, and the Complaint of the Plaintiff is hereby granted; each party shall bear the costs of suit and its own attorney's fees.