**In re Donald C. PRITCHARD, Bankrupt.**

**BANK OF MISSISSIPPI, Plaintiff,**

**v.**

**Donald C. PRITCHARD, Defendant.**

**In re Elizabeth Ann PRITCHARD, Bankrupt.**

**BANK OF MISSISSIPPI, Plaintiff,**

**v.**

**Elizabeth Ann PRITCHARD, Defendant.**

**Bankruptcy Nos. EBK 79–00155, EBK 79–00156.**

United States Bankruptcy Court, N. D. Mississippi.

June 3, 1981.

Lumpkin, Holland, Ray & Upchurch, Tupelo, Miss. (W. Reed Hillen, Tupelo, Miss., of counsel for plaintiff).

James B. Floyd, III, Tupelo, Miss., for defendants.

SUPPLEMENTARY OPINION, INCLUDING INTRODUCTORY STATEMENT, ANALYSIS OF PROOF, DISCUSSION AND CONCLUSION OF LAW

EUGENE J. RAPHAEL, Bankruptcy Judge.

*Introductory Statement:*

The Pritchards filed their petitions in bankruptcy on May 13th, 1979. Since this was before the effective date of the Bankruptcy Reform Act of 1978[1] all procedural matters are to be conducted and determined in accordance with the provisions of the Bankruptcy Act and the Rules of Bankruptcy Procedure and all questions of substantive law are to be determined under the provisions of the Bankruptcy Act, as if the Bankruptcy Reform Act of 1978 had not been enacted. P.L. 95–598, Section 403(a). Hence, Section 17 of the Bankruptcy Act

applies rather than Section 523(a)(2) of the new Title 11.

The Bank of Mississippi filed a complaint in each of these cases, seeking a determination that the debts owed it by the bankrupts were not dischargeable under Section 17(a)(2) of the Bankruptcy Act, in that the bankrupts had used their Master Charge cards in such a way as to make these debts "liabilities for obtaining money or property by false pretenses or false representations". The defendants answered and these two adversary proceedings were tried before me together. At the close of plaintiff's case, the defendants moved for a directed verdict (Tr. p. 83). I granted the motion and dismissed the complaints, relying on the case of *Davison-Paxon Co. v. Caldwell* (C.A. 5, 1940) 115 F.2d 189; cert. denied 313 U.S. 564, 61 S.Ct. 841, 85 L.Ed. 1522.

Plaintiff appealed to the District Court, and the appeal was assigned to Honorable Orma R. Smith. Judge Smith, holding that in dictating my opinion into the trial record at the close of the trial, I had failed to make findings of fact sufficient to allow an appellate court to determine whether my decision was justified, remanded the case for the purpose of making specific findings, "if such can be done on the present record; if not, then for a full trial on the merits".

Judge Smith's opinion and order indicated that the findings of fact should include findings on the following issues:

1) Whether there had been actual overt false pretenses or representations on the part of the defendants.

2) Whether the defendants, in making purchases in separate departments of the same store on the same day, did so with intent to defraud by thus keeping each individual purchase under $50.00, knowing that in the case of purchases in excess of $50.00 the merchant would have to make inquiry by telephone of the status of the account, and that such inquiry would reveal that the account was delinquent.

3) Whether the Pritchards inserted the $300.00 credit limitation in their signed application for the credit card or whether that

---

1. Except for those sections specified in Section 402(d) of that act (not applicable here) which took effect on enactment.

limitation was inserted by the plaintiff or the credit card company without the knowledge or authority of the defendants.

### Analysis of The Proof :

(a) *The Credit Limit*—The only witnesses called to the stand by the Bank were the debtors, as adverse witnesses, and David Beene, a bank employee since 1972. Mr. Beene described his position as "assistant manager, Master Charge Center at the Bank of Mississippi".

This saga starts with a written application by the Pritchards to the Bank for a Master Charge Card. They testified that they went to the Bank, obtained the printed form from the Bank, took the form home, filled it out together, signed it and then Mrs. Pritchard mailed it back to the Bank in a self-addressed business-reply envelope. The form shows "date signed" as March 29th, 1978. A rubber stamp indicates it was received March 31. The form contains a minimal amount of credit information about the debtors: their names, social security numbers, addresses, telephone numbers, dates of birth, name and address of nearest relative, names and addresses of their respective employers, positions held, gross salary, previous employer, other income, their bank and the types of accounts carried, and information as to existing credit obligations, including the name of each creditor, the balance owing and the amount of each periodic payment.

Mr. Beene testified as to the Bank's procedure when a credit application was received. The application is "sent to our credit bureau, which is checked out and sent back to us, like a credit decision is made, cards are issued, and a credit line is established. Cards would be sent out if approved. If not, it would be denied". While Mr. Beene did not specifically say that cards were issued on this Pritchard application, it is obvious from the evidence that they were.

There is no testimony in the record that any of the statements made by the Pritchards in the application for the credit card was false or misleading, and indeed the Bank makes no such claim. The only dispute about this application form is over the credit limit.

At the top of the form is a heading: "Your Request for a Master Charge Card". Just under that, in smaller type, there appears:

"I hereby request a credit limit of $_____ after reviewing my family expenses."

On the application as introduced into evidence (Plaintiff's Exhibit "2") the blank in the above sentence was filled in in ink with the figure "300.00". The Pritchards testified that they had not written the figure 300.00 in, and that when they mailed the application to the Bank nothing had been filled in this blank. They further testified that they did not have any conversation with any bank officials about it at the time when they picked up the application or later. The application was not delivered to the Bank in person. It was mailed in. There is no testimony whatever in the record with regard to any oral communication between the Pritchards and any employee of the Bank at any time. Mr. Pritchard further testified that he did not even know what a credit limit was.

The Bank sought to show that the Pritchards knew about the credit limit by having Mr. Beene testify as to the Bank's procedures with respect to delinquent accounts (Plaintiff's Exhibit "3"). These consisted of a series of letters which, Mr. Beene said, would be sent out automatically by the computer at various stages of a customer's delinquency. The computer was located in Atlanta and the mailing was done from there. Copies of the letters were not mailed to the Bank. The Pritchards denied that they ever received a letter with respect to their credit limit. The items contained in Exhibit "3" were not offered as copies of letters actually sent to the Pritchards, but merely as samples of the types of letters that the computer should have written to them. Assuming that the sending and receipt of such letters would be relevant to any of the issues in this case, I find that there is insufficient evidence that any such

letters were mailed to Mr. and Mrs. Pritchard.

Mr. Beene testified that he did not see the figure 300.00 written in; that he did not know who put it there, or whose handwriting it was. He did state that it was against the bank's policy for any employee of the bank to fill in the credit limit blank on this type of application form. However, he did not see the application when it arrived at the bank and was unable to say the application had arrived with the amount of the credit limit filled in. No other witness testified on the subject of the credit limit blank. I do not think that the testimony of Mr. Beene that it was not the policy of the bank for its employees to fill in this blank is sufficient to overcome the positive testimony of Mr. and Mrs. Pritchard that they had not filled in the 300.00 credit limit figure when the application was mailed, and that the figure was not in their handwriting.

So with respect to the 3rd question set out in Judge Smith's opinion, I find that the Bank has failed to prove that the credit limit blank was filled in by the Pritchards and I therefore find that the 300.00 figure had not been inserted by them. As to the second part of the question, there is no evidence whatever to show who did insert the 300.00 credit limit.

*Analysis Of The Proof (continued):*

(b) *Use of the Account by Debtors and The Question of Multiple Charges on the Same Day*—The monthly statements (Plaintiff's Exhibit "1") sent to the Pritchards by the bank with respect to this Master Charge account are quite revealing. In summary, they show the following:

### Monthly Statement

| Closing Date | Previous Balance | Items Charged This Month | Minimum Payment | Actual Payment | New Balance |
|---|---|---|---|---|---|
| 5-19-78 | 0.00 | 268.55 | 13.00 | none | 268.84 |
| 6-19-78 | 268.84 | 257.60 | 24.00 | 50.00 | 480.32 |
| 7-19-78 | 480.32 | 181.89 | 57.00 | none | 669.35 |
| 8-18-78 | 669.35 | 129.23 | 65.00 | 30.00 | 778.17 |
| 9-18-78 | 778.17 | 317.88 | 14.00 | 797.00 | 299.05 |
| 10-18-78 | 299.05 | 348.89 | 46.00 | none | 653.17 |
| 11-17-78 | 653.17 | 163.56 | 87.00 | none | 826.43 |
| 12-18-78 | 826.43 | 131.60 | 135.00 | none | 970.16 |
| 1-17-79 | 970.16 | 909.35 | 229.00 | none | 1,893.28 |
| 2-16-79 | 1,893.28 | 709.40 | 359.00 | none | 2,603.10 |
| 3-19-79 | 2,603.10 | 582.64 | 519.00 | none | 3,216.12 |
| 4-18-79 | 3,216.12 | 271.80 | 695.00 | none | 3,524.12 |
| 5-18-79 | 3,524.12 | 478.90 | 897.00 | none | 4,041.94 |

It will be noted that the putative credit limit of $300.00 was exceeded in the second billing period; that for the first four months only two payments were made on the account, one for $50.00 and one for $30.00, leaving a balance due for the period ending August 18, 1978, $778.17; that in the very next period that balance was wiped out by a single payment of $797.00. That large payment was received by the Bank on August 30, 1978 and represented the proceeds, or part of the proceeds, of a loan the debtors obtained from Money Mart, Inc., a personal loan company. From that time on, no payments whatever were made by the debtors on this Master Charge account.

The above table reveals the basic flaw in the Bank's procedures with respect to its Master Charge department. All records were maintained by a computer located in

Atlanta. The computer was programmed to send bills each month to card holders, but not to send copies of the bills to the Bank. It was also programmed, according to the Bank to send letters to card holders whenever a card holder went two successive months without a payment; but again, no copies of these letters were sent to the Bank. When a cardholder's account was delinquent, a note on the monthly statement chided the cardholder for his delinquency and gave him a telephone number which he was requested to call with reference to the account, but again, no notice of this request went to the Bank. In short, the Bank had established *no routines whatever* which would have enabled it to monitor the accounts of its Master Charge customers.

Of course, the failure of the Bank to keep track of the status of the debtors' account would not excuse the debtors if, in fact, they had been *guilty of any false pretenses or fraudulent misrepresentations;* but it does serve to explain how the debtors' delinquencies went undetected for so long a time and reached such outrageous proportions.

■ The Bank has claimed that the debtors deliberately kept the amount of their charge purchases at each particular store on particular occasions below $50.00, and that when they were going to charge more than that amount on a particular day at a single store they would not make all the purchases at one time, but would make multiple purchases at different times on the same day. It is well and widely known, and the court will take judicial notice, that merchants who accept Master Charge cards and other bank credit cards are required to inquire as to the status of the customer's account by telephone and obtain approval from the card company or the bank involved, whenever an attempt is made to charge more than $50.00 at the same store at one time; so, the Bank alleges, the debtors would have been prevented from running up so large an indebtedness if a larger-than-$50.00 purchase had been made, which would have resulted in the Bank becoming aware of the status of the account.

I can find no factual basis in the record to substantiate this charge. To begin with, the monthly statements reveal that there were four occasions on which *single* purchases in excess of $50.00 *were* made. These are:

| | Dated | Merchant | Amount | Balance of A/C |
|---|---|---|---|---|
| 1. | 4-22-78 | Weathers Auto Supply | 68.25 | |
| 2. | 6-28-78 | S. H. Kress, Tupelo | 60.86 | 521.32 |
| 3. | 8-12-78 | Weathers Auto Supply | 57.75 | 685.72 |
| 4. | 12-01-78 | K. Mart | 66.67 | 970.16 |

On the first of these occasions, the account had not exceeded the $300.00 credit limit. On the second and third occasions the credit limit has been substantially exceeded. On the fourth occasion the account balance was more than three times the credit limit and no payment had been made on the account for three successive calendar months. Testimony at the trial did not reveal how these charges happened to go through. One can only surmise that one of two things happened: either the merchants involved called the Bank and the charges were approved despite the status of the account; or, the merchants did not call the Bank, but the Bank later accepted the

charges and paid the merchants anyway. In either event, it is obvious, and I so find, that the Bank was not strictly enforcing either the $300.00 alleged credit limit or the $50.00 inquiry rule.

With regard to the Bank's claim that the debtors were deliberately making multiple purchases on days when they wanted to incur charges totalling more than $50.00 with the purpose of avoiding an inquiry by the merchant as to the status of the account, I find that this claim is not supported by the evidence. Analysis of the monthly statement shows that there were only six instances of multiple purchases be-

ing made on the same day at the same store and on one such occasion the aggregate purchases did not exceed $50.00. These transactions were as follows:

| Statement Closing Date | Date of Transactions | Merchant | Amount | Total |
|---|---|---|---|---|
| 6-19-78 | 5-14-78 | Mobil Oil, Dickson, TN | 41.34 | |
| | | | 13.75 | 55.09 |
| 1-17-79 | 12-14-78 | Woolco 6014, Memphis | 41.92 | |
| | 12-14-78 | Woolco 6014, Memphis | 45.42 | 87.34 |
| 3-19-79 | 2-13-79 | Woolco 6187, Tupelo | 24.69 | |
| | 2-13-79 | Woolco 6187, Tupelo | 21.99 | 46.68 |
| 3-19-79 | 2-15-79 | Walmart Disc. City | 39.86 | |
| | 2-15-79 | Walmart Disc. City (Pontotoc) | 24.27 | 64.13 |
| 3-19-79 | 2-13-79 | West End Grocery | 10.00 | |
| | | West End Grocery | 10.00 | |
| | | West End Grocery | 16.00 | |
| | | West End Grocery | 16.98 | |
| | | West End Grocery | 17.09 | |
| | | West End Grocery | 20.00 | 90.07 |
| 5-18-79 | 4-14-79 | Woolco 6187, Tupelo | 29.90 | |
| | | Woolco 6187, Tupelo | 21.48 | 51.38 |

It will be noted that on one of these occasions, five separate items were purchased at the same store. Two of these items were disputed by the debtors. On all of the other occasions there were only two purchases on the same day. One of these items was disputed and, as to the others, the debtors testified that purchases were made in different departments of the store. In any event, assuming that all of the purchases were made, there are 215 purchases listed on the account over a period of thirteen months and there are only five occasions where the multiple purchases on a single day totalled more than $50.00, compared with four occasions in the same period where a single purchase exceeded $50.00. This does not indicate to me that there was any plan by the debtors to make multiple purchases on the same day to keep the merchant involved from having to inquire as to the status of debtors' account and I find no evidence of such an intention. Accordingly, Judge Smith's second question will be answered in the negative.

*Analysis of The Proof (continued):*

(c) *Actual or Overt False Pretenses or False Representations by Defendants*

—Turning now to Judge Smith's first question, whether there had been actual overt false pretense or representation on the part of the defendants, the Bank has conceded that there were no false representations or pretenses in the written application for the card filled out by the debtors before the card was issued. There is not one word of testimony in the record of any communication by the bankrupts to the Bank, oral or written, other than their request for a credit card application blank and the completed application. This question, too, must therefore be answered in the negative.

The bankrupts, of course, knew or should have known, that their account was delinquent. While they stated, and I have found, that they did not receive the collection letters the computer was supposed to have sent them, they did receive monthly statements of their Master Charge account. On the statement for the period ending July 19, 1978 this language appears underneath the list of items charged:

"Have we missed your payment.... If you have not already mailed it, please do so today".

The same language appears on the statement for the period ending August 18, 1978. It does not appear on the next following statement, presumably because on August 30 the defendants made a payment of $797.00, as mentioned previously. The same language re-appears on the statement for the period ending October 18, 1978. Then on the statement for the period closing November 17, 1978 we find this language:

"You have missed your last two payments. Please pay now to avoid losing your credit privileges".

The December 18th statement bore this legend:

"You are seriously delinquent. Contact our collection dept. at 842–3541 to make payment arr".

The next month, the statement for the period ending January 17, 1979 put it this way:

"Your account is seriously past due. Call 601–842–3541 today".

After that the computer apparently gave up, as there are no such admonitions on the four succeeding months' statements and, by the end of April, 1979 the Bank had finally awakened to the situation and had retrieved the credit cards from the Bankrupts.

*Discussion :*

 The question for decision at the trial was whether the conduct of the Bankrupts, set forth above, was sufficient to constitute false pretenses or false representations within the meaning of Section 17(a)(2) of the Bankruptcy Act (former Section 35(a) of the old Title 11, United States Code). That question was answered for courts located in the Fifth Circuit by *Davison-Paxon Co. v. Caldwell, supra.* That case held that, to come within the meaning of the section in question, there had to be an actual misrepresentation; that the fact that a bankrupt had accepted credit at a time when he knew, or should have known, he was broke, would not give rise to an inference that the bankrupt had represented to the creditor that he intended to pay for what he bought, knowing that he had no such intention.

*Davison-Paxon* has been criticized severely by Collier and by district courts and bankruptcy courts in other circuits, which have refused to follow it. Collier on Bankruptcy (14th Edition) par. 17.16 at p. 1640; and see, for example, *In re Black* (E.D.Wis., 1974), 373 F.Supp. 105; *In re Schneider*, 3 B.C.D. 175.

The Fifth Circuit itself, has criticized *Davison-Paxon.* See *Matter of Boydston,* (C.A. 5, 1975) 520 F.2d 1098; *Matter of Wood,* (C.A. 5, 1978) 571 F.2d 284. In *Boydston,* Judge Coleman commented that "The rationale underlying *Davison-Paxon* has been severely eroded in the modern world of credit transactions. . . .". In both these Fifth Circuit cases, however, the Court declined to overrule *Davison-Paxon,* affirming the lower courts on the basis of factual findings by the bankruptcy judge which, they said, were not clearly erroneous.

Hence, *Davison-Paxon* is still the law of the Fifth Circuit and I did not feel at the trial, nor do I feel now, that a judge at the trial court level should take it on himself to overrule it. If it is to be overruled, that decision should be made by the Fifth Circuit itself. It is not for this court to say what that court will do, should it once again be offered the opportunity. I therefore granted the defendants' motion to dismiss at the end of the plaintiff's case.

It may well be that *Davison-Paxon* would no longer be applicable had this case arisen under the Code, instead of under the Bankruptcy Act. The new Title 11, Section 523(a)(2)(A), has added to false pretenses or a false representation "actual fraud, other than a statement respecting the debtor's or an insider's financial condition". It may be that the conduct of these defendants could be found to amount to "actual fraud". I make no comment as to that since, as pointed out early in this opinion, the new Bankruptcy Code does not apply to this case.