In re Katherine Elizabeth SATTERFIELD, Debtor.

OHIO CITIZENS BANK, fka Ohio Citizens Trust Company, Plaintiff,

v.

Katherine Elizabeth SATTERFIELD, Defendant.

Bankruptcy No. 80–01621.
Adv. No. 81–0062.

United States Bankruptcy Court,
N.D. Ohio, W.D.

Dec. 14, 1982.

Barry E. Savage, Toledo, Ohio, for plaintiff.

Jim Miller, Toledo, Ohio, for defendant.

## MEMORANDUM AND ORDER

WALTER J. KRASNIEWSKI, Bankruptcy Judge.

This matter came on to be heard on Plaintiff's complaint to determine the dischargeability of a debt under 11 U.S.C. § 523(a)(2)(A) alleging that Defendant used her Master Charge card to obtain money, property, or services by false pretenses, false representations, or actual fraud. Considering the evidence adduced at trial and the briefs of counsel, the Court finds the Plaintiff's claim to be partially nondischargeable.

## FACTUAL BACKGROUND

In October of 1977 the Debtor, Katherine Elizabeth Satterfield, signed an application with Plaintiff, Ohio Citizens Bank, for a Master Charge card. Debtor apparently received her card shortly thereafter.

In the latter part of 1978 and in early 1979 the evidence shows that the credit limit on Debtor's Master Charge account was $600.00. The Debtor's account was fairly active at this time and, as shown from monthly statements with billing cycle closing dates of September 22, 1978, November 22, 1978, January 23, 1979, and February 21, 1979, her account balances were $600.53, $271.43, $644.45, and $617.98 respectively.

In February of 1979 Debtor applied for an increase of her credit to $1,000.00 and, by letter dated March 7, 1979, Debtor's application was granted. From this point, Debtor's credit history seems unremarkable except for Debtor being $79.09 over her $1,000.00 credit limit on the billing cycle ending March 24, 1980 and $229.24 over her $1,000.00 credit limit on the billing cycle ending August 22, 1980.

The Debtor testified that there were some significant changes in her financial condition beginning about mid 1980. Sometime about June or July of 1980 she stopped making payments on her Master Charge account. Toward the end of August, she lost her position with Hickory Farms of Ohio. On August 21, 1980, she spoke to her attorney about the possibility of filing bankruptcy. Finally, on October 3, 1980, a petition under Chapter 7 of the Bankruptcy Code was filed on her behalf.

After meeting with her attorney on August 21, 1980, at which time she executed her voluntary petition, statement of affairs,

**556**

and schedules, a dramatic increase in the level of activity in Debtor's Master Charge account occurred. The balance owing Ohio Citizens increased from $1,229.24 for the billing cycle closing August 22, 1980 to $4,250.42 and $5,240.66 for the billing cycles closing on September 23, 1980 and October 22, 1980 respectively. From the statements introduced into evidence, the average number of monthly purchases increased from less than 10 for all periods ending with the billing cycle closing August 22, 1980 to more than 35 for the billing cycles closing September 23, 1980 and October 22, 1980. Significantly, almost all the transactions, which increased the balance on her account from $1,229.24 to $5,240.66, occurred between August 21, 1980, the date she met with her attorney, and September 21, 1980, near the time her credit card was taken from her by a merchant when she attempted to purchase gas.

Debtor testified that the changes subsequent to August 21, 1980 were for her living and travel expenses while she determined if she would file for bankruptcy. This decision assertedly hinged upon whether a $20,000.00 certificate of deposit in Debtor's name, which had been pledged as collateral for a loan to a corporation located in Florida, had been applied to the obligation and whether she could profitably sell certain real property she owned in Michigan. From the number and origin of the charges listed on Debtor's monthly Master Charge statements, Debtor's inquiry into these circumstances apparently precipitated a month long traveling and spending spree involving more than 70 separate purchases from merchants in several different cities in the states of Florida, Georgia, Kentucky, Michigan, Ohio, and Tennessee.

Letters dated August 11, 1980 and September 15, 1980 notifying Debtor that her credit privileges were revoked and that she should surrender her credit card were introduced into evidence. Although Debtor denies receipt of the August 11, 1980 letter and there is conflicting evidence that it was ever sent, the Debtor did acknowledge receipt by certified mail of the September 15, 1980 letter on September 23, 1980. Also,

sometime in September of 1980, Plaintiff unsuccessfully attempted to recover Debtor's Master Charge card through the use of an investigator employed by its credit department.

## DISCUSSION

Section 523 of the Bankruptcy Code, 11 U.S.C. § 101 et seq., provides, in relevant part, as follows:

> (a) A discharge under section 727, 1141, or 1328(b) of this title does not discharge an individual debtor from any debt—
>
> . . . .
>
> (2) for obtaining money, property, services, or an extension, renewal, or refinance of credit, by—
>
> (A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition.

Section 523(a)(2)(A) is substantially identical to the provisions of § 17(a)(2) of the Bankruptcy Act. In general, the elements of a prima facie case which a creditor must prove in order to have a debt declared nondischargeable under both sections are:

1.) that the debtor made representations;
2.) that at the time he knew they were false;
3.) that he made them with the intent to deceive the creditor;
4.) that the creditor relied on the representations; and
5.) that the creditor's loss was the proximate result of the misrepresentations having been made.

*See, e.g., Lowe v. Roberto's, Inc. (In re Roberto's, Inc.),* 18 B.R. 551 (Bkrtcy.S.D. Fla.1982); *Ohio Citizens Trust Co. v. Victorian (In re Victorian),* 8 B.R. 196 (Bkrtcy.N. D.Ohio 1981). Furthermore, the majority of the Courts that have considered the question have held that the elements of a cause of action under § 523(a)(2)(A) must be proved by clear and convincing evidence, *e.g., Lowe v. Roberto's, Inc.,* 18 B.R. at 554; *McIssac v. Huckins (In re Huckins),* 17 B.R. 620, 624 (Bkrtcy.D.Me.1982); *Albritton v.*

*Albritton (In re Albritton),* 17 B.R. 555, 557 (Bkrtcy.M.D.Fla.1982); *Sylvester v. Stone (In re Stone),* 11 B.R. 209, 211 (Bkrtcy.D.S. C.1981); *Northeast Bank v. Lyon (In re Lyon),* 8 B.R. 152, 154 (Bkrtcy.D.Me.1981); *contra, Arterburn v. Arterburn (In re Arterburn),* 15 B.R. 189, 191, 8 B.C.D. 629, 630 (Bkrtcy.W.D.Okla.1981), a conclusion with which this Court is in agreement. The discussion below demonstrates that Plaintiff has met the above burden under the circumstances of this case.

### 1. THE REPRESENTATIONS

■ It has generally been held that the purchase of goods through the use of a credit card is an implied representation to the merchant and the issuer of the card that the buyer has the means and the intention to pay for them. *See, e.g., In re Black,* 373 F.Supp. 105 (E.D.Wis.1974); *Strawbridge & Clothier v. Ciavarelli (In re Ciavarelli),* 16 B.R. 369 (Bkrtcy.E.D.Pa.1982); *Southeast Services, Inc., v. Vegh (In re Vegh),* 14 B.R. 345 (Bkrtcy.S.D.Fla.1981); *H.C. Prange Co. v. Schnore (In re Schnore),* 13 B.R. 249 (Bkrtcy.W.D.Wis.1981); *Ranier Bank v. Poteet (In re Poteet),* 12 B.R. 565 (Bkrtcy.N.D.Tex.1981). The long standing decision of the United States Court of Appeals for the Fifth Circuit in *Davison-Paxon Co. v. Caldwell,* 115 F.2d 189 (1940) *cert. denied,* 313 U.S. 564, 61 S.Ct. 841, 85 L.Ed. 1523 (1941), that would require an actual overt representation in order to hold a debt nondischargeable has been questioned by the 5th Circuit itself in *Sears, Roebuck & Co. v. Boydston (In re Boydston),* 520 F.2d 1098, 1101, and is explicitly rejected by this Court. As one Judge noted:

> There was rational support for the decision in *Davison-Paxon* at the time it was delivered in 1940. At that time a credit transaction was primarily a personal one between the debtor and the creditor, or between the buyer and the seller, with face-to-face confrontation. There was opportunity for the issuer of credit to make personal inquiry of the debtor at the time each credit transaction was made. The changes required by the subsequent development of the credit card

system is apparent. In this area the issuer of credit is the bank, which is frequently located many miles from the place where the purchase with the credit card is made. It is unrealistic to require an overt expression on the part of the purchaser to both the seller and to the bank that he is solvent and intends to pay for the purchase each time that he uses the credit card. *The Davison-Paxon* requirements are no longer relevant to the credit transactions of the type involved in this case and are rejected.

*In re Poteet,* 11 B.R. at 568.

In the present case, through the numerous instances in which Debtor used her credit card in making the transactions previously described, Debtor impliedly represented to both the merchant and the issuer of the card that she had the present intention and ability to pay for those purchases.

### 2. FALSITY AND INTENTION TO DECEIVE

■ The second and third elements of a cause of action under § 523(a)(2)(A), the requirements of demonstrating the falsity of the statement and fraudulent intent, are interrelated and will be discussed together.

The falsity of the implied representations previously discussed can be shown by proving that, at the time Debtor made the purchases, she had either no ability or no intention to pay for the goods. The intention to deceive can normally be proven only by circumstantial evidence demonstrating a subjective intent on the Debtor's part to deceive the merchant or issuer into believing that he or she could pay for the goods when this was not the case.

In *First National Bank & Trust Co. v. Stewart (In re Stewart),* 7 B.R. 551, 555 (Bkrtcy.M.D.Ga.1980) the Court noted the following factors as relevant in establishing the existence or nonexistence of an actual intent to deceive:

1. the length of time between the charges made and the filing of bankruptcy;

2. whether or not an attorney has been consulted concerning the filing of

bankruptcy before the charges were made;

3. the number of charges made;

4. the amount of the charges;

5. the financial condition of the debtor at the time the charges are made; and

6. whether the charges were above the credit limit of the account.

(footnote omitted)

Under the circumstances of this case, an analysis of these factors leads the Court to the conclusion that there is clear and convincing evidence that the representations were knowingly and intentionally made with an actual intent to deceive.

All of the charges made by the Debtor subsequent to August 21, 1982 were made within 6 weeks of the date the Chapter 7 petition was filed on October 3, 1980. In addition, considering the past credit history of Debtor, the most dramatic increase in the pattern of Debtor's use of her credit card occurred subsequent to August 21, 1982 after she not only spoke with her attorney about filing bankruptcy but actually executed the petition, statement of affairs, and schedules filed with the Court.

Debtor contends that by filing her petition on October 3, 1980 as executed on August 21, 1980, she made no effort to conceal her consultation with counsel in an effort to resolve her financial difficulties. If there was an intention to deceive or defraud, it is argued, Debtor would have instructed counsel to prepare a new petition or, alternatively would have retained new counsel. In addition, Debtor contends, there is no evidence Debtor's financial affairs were in a state of collapse, her assets, at worst, nearly approximating her liabilities and, at best, far in excess of her liabilities.

The fact that Debtor consulted counsel about filing bankruptcy shortly before incurring the majority of the indebtedness claimed as nondischargeable is, in this Court's opinion, persuasive evidence of an intent to deceive. There is an inherent contradiction in contemplating bankruptcy, on the one hand, and a representation that one has the ability and intent to pay for goods purchased on credit, on the other. The Debtor may have made no effort to conceal her consultation with counsel but this cannot somehow negate strength of the inference that she was deceiving her creditors. Significant in this regard are the remarks of the Court in *Nevada National Bank v. Schneider (In re Schneider)*, 3 B.C.D. 175 (Bkrtcy.D.Nev.1977) *quoted in H.C. Prange Co. v. Schnore (In re Schnore)*, 13 B.R. 249, 255 (Bkrtcy.W.D.Wis.1981):

It is difficult to read the human mind as to the precise moment a person 'decides' to file bankruptcy. It seems only fair that so long as defendant had called upon an attorney for that specific purpose and had considered and had been considering bankruptcy for some time she was at very least deceiving her creditors by giving a false impression that she intended to pay. It is plain that one who presents herself as a purchaser with good intentions should not be at the same time 'considering' bankruptcy .... False pretenses need not be overt in uttering a check with insufficient funds. I see no difference in uttering a credit card with the transaction under the personal vacillation of the purchaser as to whether or not he will or will not pay depending upon whether he will or will not file for bankruptcy. Certainly there is no pure unadulterated intention to pay when the transaction is shadowed by a pall of indecision as to whether bankruptcy will be filed. Business credit demands a more honest state of mind and if there be reasonable doubt that payment will be made it borders on cheating and should not be condoned even though Bankruptcy Courts are certainly designed to enforce the humane law of discharge to aid bankrupts in a fresh start.

The Debtor's arguments relative to her financial condition at this time centers around the fact that her listed assets on her schedules executed August 21, 1980 total $21,950.00 while her debts totalled $22,-900.00. If a $20,000.00 certificate of deposit in Debtor's name could have been liquidated

and a parcel of real estate in Michigan sold for more than the amount listed in her schedules, Debtor argues, she would have had a positive net worth of over $20,000.00. When the situation is viewed in this light, it is argued, it is clear that the Debtor was not charging beyond her means to pay.

The $20,000.00 certificate of deposit, however, has at all times herein relevant been pledged as collateral for the obligation of a corporation Debtor was associated with to a bank in Florida. In addition, the Debtor's statement of affairs reveals that, at the time of their execution she already believed the certificate had been applied by the bank against the corporate obligation, which presumably was in default. The mechanism by which this asset could have become available for Debtor's use in meeting her obligations to her creditors remains unclear.

The Michigan real estate, Debtor argues, may have been worth a sum in excess of the $17,500.00 listed as its market value in her schedules. Debtor testified that the property in question was purchased for $43,000.00 in February of 1980 and then subsequently damaged in a fire. It was listed with a real estate broker in May or June of 1980 for an asking price of $24,000.00. The fact that Debtor listed the real estate's market value as being only $17,500.00 in her schedules raises questions as to the bona fides of her belief that it may have been worth more. In any event, the fact that debtor made no payment on her Master Charge account after June or July of 1980, that she was out of work, and that she was considering bankruptcy are, in the Court's opinion, more reliable indicia of her reasonable perception of her financial strength.

The number and amount of the charges incurred are also significant when considering the financial condition of the Debtor. In the period of approximately thirty days between August 21, 1981 and late September 1981, when debtor's credit card was taken from her, she made more than seventy purchases totalling approximately four thousand dollars. At the same time, considering her financial condition discussed above, she couldn't have reasonably expected to be able to repay these obligations. "Such a gross disparity between the amount of debt and the means to pay, negatives both ability and intent to pay." *Southeast Services, Inc. v. Vegh (In re Vegh)*, 14 B.R. 345, 347 (Bkrtcy.S.D.Fla.1981).

Debtor argues that the fact that she made nearly a dozen individual purchases in amounts in excess of $50.00 between August 21, 1980 and the filing of the petition is inconsistent with a scheme of actual fraud and false representation. In so arguing Debtor acknowledges that several Courts have found an intent to defraud in circumstances where a purposeful course of conduct to limit purchases in amounts below $50.00 is present. *See, e.g. In re Vegh, supra; Huntington National Bank v. Schartner (In re Schartner)*, 7 B.R. 885 (Bkrtcy.N.D.Ohio 1980).

When a customer makes a purchase in excess of $50.00, the Courts have recognized, merchants who accept credit cards are required to inquire into the status of the customer's account by telephone and obtain prior approval from the issuer for the purchase. *See Bank of Mississippi v. Pritchard (In re Pritchard)*, 11 B.R. 614 (Bkrtcy.N.D.Miss.1981). Recognizing this, in the present case, either the merchants involved called the bank and gained approval for the purchases despite Debtor having exceeded her credit limit, or the merchants did not call, the bank later accepting the charges and paying the merchants anyway.

The Court is unpersuaded by this line of reasoning. Despite the fact that all the charges this Court finds nondischargeable were made at a time when Debtor had already exceeded her credit limit, which should have resulted in the banks disapproving any charges when authorization was needed, this more nearly evidences a pattern and practice of negligent handling of charge accounts on the bank's part than it does lack of an intention to deceive.

The Debtor knew at the time she made the purchases that she had exceeded her credit limit. All of the statements introduced into evidence for the billing cycles closing August 22, 1980, September 23,

1980, and October 22, 1980 show both a balance in excess of her $1,000.00 credit limit and a demand for a minimum payment for all amounts in excess of that credit limit.

This conduct, at a time when she had no work and was considering filing bankruptcy, clearly evidences an intent to deceive on her part.

■ Of course, "[e]xceeding credit card limits is not *ipso facto* proof of intent to obtain money or property by false pretenses, false representation, or fraud in violation of 11 U.S.C. § 523(a)(2)(A)". *First National Bank v. Wright, (In re Wright)*, 8 B.R. 625, 628 (Bkrtcy.S.D.Ohio 1981). If Debtor knew or should have known that she would not be able to pay for the purchases or if she made the purchase with no intention of repayment, it is irrelevant whether she had a credit limit to cover such purchases. *Id.* at 627.

■ The critical element, the lack of an intention or the inability to pay for the goods, must exist at the "time of purchase". A debt will be discharged, for example, if the creditor cannot show that the bad intent existed at the time of purchase even though the debtor subsequently decided not to pay for the goods. *In re Schnore,* 13 B.R. at 255. Alternatively, the ᵗcreditor must show that the debtor's financial condition at the time of purchase "was such that it presupposes his inability to pay and the consequent presumption of an intent not to repay. *See Virginia National Bank v. Brewster (In re Brewster),* 5 B.C.D. 783, 784 (Bkrtcy.E.D.Va.1979). As a result, the Court must determine the time when the bad intent developed which may necessitate a split of the obligation into dischargeable and nondischargeable portions.

In the present case, it is the determination of the Court that the intention not to repay developed at or near the time Debtor visited her attorney on August 21, 1980. Since, of the $5,240.66 claimed by Plaintiff, only a portion of this debt arose as a result of purchases subsequent to August 21, 1980, the Court must examine evidence to determine the precise amount to be held nondischargeable.

The Debtor's Master Charge statement with the billing cycle closing date of August 22, 1980 has a closing balance of $1,229.24. None of the transactions listed on this statement occurred subsequent to August 21, 1980 and, consequently, the entire amount is dischargeable. An examination of the statements with billing cycle closing dates on September 23, 1980 and October 22, 1980 indicates that all the transactions listed, with the exception of two in amounts of $36.00 and $16.75, occurred subsequent to August 21, 1980. From the total $5,240.66 claimed by Plaintiff to be nondischargeable then, $1,229.24 plus $36.00 plus $16.75 is subtracted, leaving a difference of $3,958.67 which is nondischargeable.

In sum, it is the Court's determination that the evidence in this case shows that subsequent to August 21, 1980 Debtor had neither the ability nor the intention to pay for the goods she purchased, rendering her implied representation to the contrary untrue. In addition, from an examination of all the facts and circumstances of this case, the Court concludes that the representations were knowingly and intentionally made with an actual intent to deceive the merchant and issuer into believing she intended or was able to repay.

### 3. RELIANCE

■ The fourth element of a cause of action to determine the dischargeability of a debt under § 523(a)(2)(A) is the creditor's actual and reasonable reliance on the representations of the debtor. Whereas reliance in the normal credit transaction contemplates that the issuer of credit make personal inquiry of the debtor at the time of each credit transaction, credit card cases involve a continuing relationship between debtor and creditor and only infrequent inquiry as to the continuing state of the debtor's financial affairs. As a result, reliance, or the lack thereof, cannot be shown as it is in the normal credit transaction by the creditor's conduct in response to the debtor's statement of his affairs in a financial statement. For this reason, actual reliance is evidenced

by the fact that the card holder actually purchased goods on credit. *See In re Schnore,* 13 B.R. at 257. The reasonableness of the reliance should depend upon the debtor's conduct in meeting the obligations incurred through credit card use. *Id.*

Citing *Manufacturers National Bank v. Curcio (In re Curcio),* 1 B.R. 727, 5 B.C.D. 1131 (Bkrtcy.E.D.Mich.1979), Debtor contends that by virtue of Plaintiff's asserted failure to object to Debtor's use of her credit card to make purchases in excess of her established credit limit it has waived the right to contend that the charges incurred in excess of the stated credit limit constitute obtaining property by false pretenses or false representations.

In *Curcio* the bankrupt, over a period of months, made charges on his Master Charge account in excess of his established credit limit. The bank sent him monthly statements indicating that he had exceeded his charge limit and also specified a minimum monthly payment apparently computed as a specified percentage of the outstanding indebtedness but without any relationship to the amounts by which he had exceeded his charge limit. None of the statements demanded that the bankrupt return his credit card or directed that he discontinue using his card until the balance was brought within the established credit limit. After a period of months, the bank sent the bankrupt letters indicating that his Master Charge privileges were revoked and requested that he return his credit card to the bank.

The Court made the following analysis of Section 17a(2) of the Bankruptcy Act of 1898, as amended:

> In making a credit card purchase, the holder of a charge card represents that he is a valid holder of the card and that the purchase is being made in compliance with the conditions subject to which the card was issued. Purchases made by a credit cardholder in excess of the stated credit limit, therefore, constitute obtaining money or property by false representations within the meaning of Section 17a(2), unless the credit card issuer had consented to, or acquiesced in purchases in excess of that limit.

1 B.R. at 728, 5 B.C.D. at 1132. After concluding that, under the circumstances of that case, the bank had waived the right to rely upon the bankrupt's agreement not to exceed her credit limit as a ground for nondischargeability, except for charges incurred subsequent to the bank's letter revoking the bankrupt's credit card privileges, the Court held as follows:

> The issuer of a credit card must make a choice. If it intends to rely upon an agreed charge limit, it must advise the holder of the card, who exceeds the limit, that he is not to continue to incur additional charges until he has made payments to get under his charge limit. If the Bank does not do so, it in effect waives the right to contend that charges incurred in excess of the stated limit constitute obtaining property by false representation or false pretenses.

1 B.R. at 729, 5 B.C.D. at 1132.

The Court feels the facts in *Curcio* are distinguishable from the case at bar. In *Curcio* the monthly statements received by the bankrupt called for a minimum payment apparently computed as a specified percentage of the outstanding indebtedness but without any relationship to the amounts by which the bankrupt had exceeded her charge limit. In the present case, in all instances where the Debtor had exceeded her established credit limit, the Debtor's monthly Master Charge statements clearly indicated that Debtor had used all of her available credit and that the minimum payment due was equal to or greater than the amounts by which Debtor exceeded her credit limit. For example, in August of 1980 when Debtor's balance on her charge account was $229.24 in excess of her credit limit, her monthly statement clearly shows her available credit as "none" and called for a minimum payment of $229.24. Similarly, in September and October of 1980, Debtor's Master Charge statement showed that she had utilized all of her available credit and called for minimum payments of $3,250.42 and $4,240.66 respectively, the precise amounts by which she exceeded her $1,000.00 credit limit.

562

At this same time the Plaintiff took steps to revoke Debtor's credit privileges and to recover the Master Charge card it had issued. In evidence is a letter to Debtor dated August 11, 1980 which purported to notify Debtor that her account was in default, cancelled her credit privileges, and demanded the immediate surrender of her Master Charge card. Although Debtor denies having received this letter and there is some conflicting evidence as to whether this letter was ever sent, an identical letter dated September 15, 1980 was sent to the Debtor by certified mail and received by her on September 23, 1980. Also, in September of 1980, Plaintiff utilized a credit investigator on its staff in an attempt to recover the Debtor's Master Charge card. Although at this same time Plaintiff unexplainably was accepting charges in amounts greater than $50.00 dollars which presumably would require the merchant involved to inquire as to the status of Debtor's account, as previously stated, this more nearly evidences a pattern of negligent handling of Debtor's account than' an acquiescence in her exceeding her credit limit. This negligence should not be a legally sufficient defense when the evidence clearly shows an actual intent to deceive a credit card issuer that Debtor has either the ability or the intent to pay for the purchases when this is not the case. *See Southeast Services, Inc. v. Vegh (In re Vegh)*, 14 B.R. 345, 348 (Bkrtcy.S.D.Fla.1981).

The Court also takes issue with the conclusions of law reached by the Court in *Curcio.* The conclusion reached in *Curcio* was that purchases made by a credit card holder in excess of the stated credit limit constitute obtaining money or property by false representations unless the credit card issuer has consented to, or acquiesced in purchases in the excess of that limit. In contrast, this Court has followed the view that exceeding the credit limit is not *ipso facto* proof of an intent to obtain money or property by false pretenses, false representation or actual fraud under § 523(a)(2)(A).

The determinative factor, under this view, is the lack of an intention or inability to pay for the goods at the time of purchase, irrespective of whether the purchases resulted in the account being in excess of or below the agreed credit limit. Exceeding the established credit limit is, however, one of several factors which can be considered by the Court in making this determination.

■ Similarly, in this Court's opinion, the failure of the card issuer to notify the card holder to discontinue use of the credit card until its balance is within the established credit limit or to demand surrender of the card when the established credit limit is exceeded should not be construed as an automatic consent to or acquiescence in purchases in excess of the established credit limit, thereby negating any reasonable reliance on the issuer's part. The notification or failure to notify should be only one factor considered in the Court's determination of whether the issuer reasonably relied on the card holder's representation that he had the present intention and ability to pay.

In the present case, although Debtor had from time to time exceeded her established credit limit in varying amounts, on the whole, the evidence shows that Debtor was able to substantially meet her obligations to the Plaintiff through the course of her use of her credit card from its issuance in 1977 until she met with financial difficulty near the middle of 1980. As a result, this Court concludes that Plaintiff actually and reasonably relied on Debtor continuing to meet her obligations on her charge account until Debtor unexpectedly went on a spending spree while actively considering filing for bankruptcy. While the bank was somewhat negligent in handling the account both in terms of insuring that Debtor was notified that credit privileges had been revoked and accepting charges which should have triggered inquiry into the status of Debtor's charge account, this is not a legally sufficient defense to Plaintiff's cause of action.

### 4. PROXIMATE CAUSE

Plaintiff suffered its loss as a direct consequence of Debtor's use of her credit card after August 21, 1980 and, therefore, there is no question that its loss was the proximate result of the misrepresentations having been made.

For the foregoing reasons, it is hereby,

ORDERED, ADJUDGED, AND DE-CREED that Plaintiff have judgment against Debtor in the amount of $3,958.67 and the same hereby is nondischargeable pursuant to 11 U.S.C. § 523(a)(2)(A).