**In re George F. LYON, Melody J. Lyon, Debtors.**

**NORTHEAST BANK OF LEWISTON AND AUBURN, Plaintiff,**

v.

**George F. LYON, Melody J. Lyon, Defendants.**

**Bankruptcy No. 279–00685. Adv. No. 280–0013.**

United States Bankruptcy Court, D. Maine.

Jan. 7, 1981.

Daniel Bates, Burke, Meyer & Bates, Lewiston, Maine, for defendants.

Robert A. Laskoff, Berman, Berman, Simmons, P. A., Lewiston, Maine, for plaintiff.

---

MEMORANDUM DECISION

FREDERICK A. JOHNSON, Bankruptcy Judge.

In this proceeding the Plaintiff Bank seeks a determination that its claim in the amount of $1,881.00 is not dischargeable.[1] The Bank alleges that the Debtors, through misuse of their VISA credit card, are guilty of obtaining money, property and services by false pretenses or false representations within the meaning of Section 523(a)(2)(A) of the Bankruptcy Code. [11 U.S.C. § 523(a)(2)(A)]. The Court concludes that the Bank has failed to establish the necessary fraudulent intent.

Defendant Melody J. Lyon was issued a BankAmericard (now VISA) in her former name, Melody J. Ham, on or about October 27, 1977. Her "credit line" was established at $600. The account was changed to Melody J. Lyon on or about September 22, 1978. Her husband, Defendant George F. Lyon, was added as an "authorized user" on or about March 2, 1979.

Until March of 1979 the history of this account was unremarkable. The Debtors always managed to pay at least the "minimum payment due" on or before its due date.

On March 2, 1979 the Debtors received a $200 cash advance. Commencing on March 3, 1979 and continuing through March 22, 1979, the Debtors, through nearly daily use of their credit cards, purchased merchandise and services totalling $1,381.42.[2]

All of the purchases appear to be routine household items or automobile repairs and parts. The largest purchase was a 12 inch black and white television set, purchased on sale at $79.00 plus tax and the largest single transaction was $87.11 for repairs to the Debtors' 1973 Volkswagen. No luxury items are evident from a careful review of the sales slips.

During the time in question, the Debtors were fixing up their apartment and many of the purchases were obviously made for that purpose.

At the time of the purchases the Debtors were insolvent, but both were employed. Their combined gross income was about $15,000 a year and their combined take home pay was about $280 a week.

On or about March 15, 1979 the Bank mailed a monthly statement to the Debtors for a billing cycle ending March 14th. The statement reflects a "new balance" of $651.37, a "minimum payment due" of $46.00 and a "payment due date" of April 8, 1979. The Debtors should have been able to pay the "minimum payment due" on or before April 8th.

On March 22, 1979, after having discovered that the Debtors had greatly exceeded their credit line and after two unsuccessful attempts to call the Debtors by telephone, a bank official went to the Debtors' home where he picked up one VISA credit card. The other credit card was later picked up from a local merchant. No charges were made after March 22nd.[3]

On March 29, 1979 a "Notice of Right to Cure" was mailed to each Debtor by certified mail. These notices were returned to the Bank unclaimed on April 18th and remailed to the Debtors on the same date by regular mail. The notices demanded payment of $1,679.17 on or before April 18, 1979.

On April 24, 1979 a Bank official again visited the Debtors' home in an effort to collect the account.

The Debtors were not fully aware of the seriousness of their financial difficulties until the visit of the bank official on March

---

1. The Bank, by its Complaint, also objected to the Debtors' discharge. The objection to discharge was withdrawn before trial.

2. Actually, $1,424.26 in purchases were made but the Debtors received $42.84 in credits for items returned.

3. Plaintiff's Exhibit 4, a recapitulation of charges made, indicates three charges made on March 27th and one on March 26th. Careful examination of two of the sales slips indicates that these charges were made on March 22nd rather than March 27th. Two other sales slips carry no date except for a pencil notation, obviously made some time after the sale.

154

22, 1979, although they knew that they had exceeded their credit line. Bankruptcy and a wage earner plan were discussed during that visit. The Debtors first contacted their lawyer regarding bankruptcy or a wage earner plan on March 25, 1979.

The Debtors did not file their voluntary joint petition seeking relief under Chapter 7 of the Code until November 21, 1979 after having tried Credit Counselling and after an unsuccessful attempt to obtain a debt consolidation loan from another local bank.

### DISCUSSION

Section 523 of the Bankruptcy Code, as it pertains to this proceeding, provides:

(a) A discharge under Section 727 ... of this title does not discharge an individual debtor from any debt—

.    .    .    .    .

(2) for obtaining money, property, [or] services ... by—

(A) false pretenses, a false representation, or actual fraud....

A careful reading of Subsection (a)(2)(A) and the legislative history reveals a congressional intent not to change existing law in cases such as the one under consideration here.

Subparagraph (A) is intended to codify current case law e. g. *Neal v. Clark*, 95 U.S. 704 [24 L.Ed. 586] (1887) which interprets 'fraud' to mean actual or positive fraud rather than fraud implied in law.... 124 Cong.Rec.H. 11095 and 11096, House debates 9/28/78; S. 17412, Senate debate 10/5/78 printed 10/6/78. *See also* Collier, 15th Ed. ¶ 523.08[4] & [5].

This Court, in similar cases, decided under Section 17(a)(2) of the Bankruptcy Act,[4] has ruled that the purchase of goods on credit by a debtor who does not intend to pay for them constitutes obtaining property by false pretenses or false representations and that the intent not to pay may be inferred from proven facts. Thus, in *In re Charette*, BK-75-974 (1976), where the

bankrupt was unemployed, hopelessly insolvent and with no prospects, ran up in excess of $300 in credit card debt in the week before verifying his bankruptcy petition, this Court ruled that the debt was not discharged.

Did the Debtors, Mr. and Mrs. Lyons, by use of their VISA credit cards obtain money, property or services with the intent not to pay for them?

The Debtors, of course, deny this. We must, therefore, search for proven facts from which their fraudulent intent may be inferred.

■ A primary purpose of the Bankruptcy Code is to give the honest debtor a fresh start. The Code's provisions are to be construed, when reasonably possible, in harmony with that purpose so as to effectuate its general purpose and policy. *See Local Loan Co. v. Hunt*, 292 U.S. 234, 54 S.Ct. 695, 78 L.Ed. 1230 (1934); *Lines v. Frederick et al.*, 400 U.S. 18, 91 S.Ct. 113, 27 L.Ed.2d 124 (1970). In this Court's view this means that this Plaintiff must prove all of the elements of its case by clear and convincing evidence. *In re Huff*, 1 B.R. 354, 1 C.B.C. 2nd, 171 (Bkrtcy.D.Utah, 1979). *See also* a 1976 decision of this Court, *In re Huth*, BK-75-308/9.

■ The Bank argues that by exceeding their "credit line" and continuing to incur debt on their VISA credit card the Debtors were obtaining money, property or services by false pretenses or false representations. The Court does not agree with this. Most courts, including this one, that have considered the issue have decided that exceeding the "credit line," without more, is not sufficient to infer an intent not to pay. *See In re Parker*, 1 B.R. 176, 5 B.C.D. 1035 (Bkrtcy.E.D.Tenn.1979); *In re Charette*, supra; *In re Paul*, BK-77-640 (S.D.Me.1979).

The Bank also alleged that the Debtors deliberately made purchases of less than $50 in order to avoid the so-called "call-in

---

4. Section 17 provided:

a. a discharge in bankruptcy shall release a bankrupt from all of his ... debts ... except such as ... (2) are liabilities for obtaining money or property by false pretenses or false representations....

authorization limit." There is no evidence to support this allegation and the Bank did not pursue it in its brief.

 The Debtors now admit, as they must, that they used their credit unwisely. Mr. Lyon, in particular, exercised extremely poor judgment. It was he who purchased goods and services in excess of $900 during this period and who, in addition, obtained a $200 cash advance from the Bank.[5]

The Court is unable to find, however, that the Debtors made the purchases with the intent not to pay for them. The Debtors at the time were both employed, with the expectation that their employment would continue. Most of the purchases were non-recurring items used for fixing up their apartment and six year old automobile. They were under the impression that they were required to pay only the "minimum payment due" on their credit cards each month. Although they were insolvent at the time of the purchases they were not aware of their precarious financial posture until it was too late.

There is no evidence that the Debtors contemplated bankruptcy until after a Bank official came to their home on March 22, 1979. Only then, during a discussion of their financial problems with the Bank official, was bankruptcy mentioned. The Debtors first consulted their attorney regarding bankruptcy three days later, on March 25th.

Even after consulting their attorney the Debtors attempted to avoid bankruptcy. Mr. Lyon attempted credit counselling during April and the Debtors tried unsuccessfully to obtain a debt consolidation loan in August. Their Chapter 7 Petition was eventually filed on November 21, 1979.

There is evidence that the Debtors attempted to avoid their creditors, and in particular the Bank, just prior to surrendering their credit cards on March 22nd. Of course, this was wrong and is evidence of bad faith on the part of the Debtors. But it falls far short of the clear and convincing evidence required to establish that at the time of the purchases the Debtors did not intend to pay for them or that they were so hopelessly insolvent that they knew or should have known that they would be unable to pay. See In re Black, 373 F.Supp. 105 (E.D.Wis.1974); In re Charette, supra.

An appropriate order will be entered forthwith.

---

5. These figures are obtained from the sales slips, which the Court has carefully examined.

The Debtors testified that Mr. Lyon "usually does the errands" for the family.