**In re Paul D. HUCKINS, Debtor.**

**John T. McISAAC, Irene McIsaac, Plaintiffs,**

v.

**Paul D. HUCKINS, Defendant.**

**Bankruptcy No. 280–00432.
Adv. No. 280–0110.**

United States Bankruptcy Court,
D. Maine.

Feb. 4, 1982.

Michael T. Healy, Verrill & Dana, Portland, Me., for plaintiffs.

Steven Cope, Cope, Cope & Carlisle, Portland, Me., for defendant.

Thomas F. Malone, Jr., Gorham, Me., trustee.

## MEMORANDUM OPINION

FREDERICK A. JOHNSON, Bankruptcy Judge.

This adversary proceeding arises out of a dispute which has been smoldering since the fall of 1976. The Plaintiffs now seek a determination that their claim against the Debtor is excepted from discharge on the ground that the Debtor obtained money from the Plaintiffs by false pretenses, false representation, or fraud.

After carefully reviewing the evidence the Court concludes that the Debtor did obtain money from the Plaintiffs by a false representation.

In 1975 the Debtor was a general partner and president of Indian Head Estates, a Maine partnership. The partnership owned a small housing development, with the same name, located in the Town of Wells. The

development was situated upon 20 acres more or less purchased by the Debtor and Harry V. Catsoulis, also a general partner, on September 29, 1975 and conveyed by them to the partnership.

When the Debtor and his partner purchased the 20 acres they were unaware that the property, or part of it, had served the Town of Wells, in former years, as a town dump, or disposal site.

During November of 1975 the foundation for what was to be the Plaintiffs' house was poured. During December the well which was to serve the house, was drilled. The house was completed during February or March of 1976.

■ On October 6, 1976 the Plaintiffs were shown the house by a real estate broker. The Debtor was present. After an examination of the house they signed a contract for its purchase. The Debtor also signed the contract in his capacity as President of the partnership.[1]

On October 10, 1976, the Plaintiffs visited the house in order to check it out and show it to Mrs. McIsaac's parents. The Debtor was present. During this visit the Plaintiffs turned on the water for the first time. The water had a very bad smell and taste. When the Plaintiffs questioned the Debtor about this he assured them that the water was fine, that it was a newly drilled well and that all it needed was flushing.

The Debtor explained to the Plaintiffs, who were unfamiliar with rural living, that flushing merely meant running the water for a few hours in order to flush out old water that had been standing in the system for several months.

On the next weekend the Plaintiffs visited the house again with another relative.

In checking the water the Plaintiffs found that it still had an offensive odor. The Debtor again assured the Plaintiffs that all the water needed was a good flushing, that he had been too busy to do it, but that he would take care of it.

On November 15th the Plaintiffs again visited the property for the specific purpose of checking the water. When they arrived on the premises they found the Debtor and another man in the basement installing a water softener. Mr. Huckins again assured the Plaintiffs that a water softener would take care of any problem and that he had not yet had time to flush the system. He promised to take care of it.

On November 19th the closing on the property was held. Mrs. McIsaac was reluctant to go through with the closing until the problem with the water was settled. Again, the Debtor assured the Plaintiffs that there was no problem with the water that a good flushing would not take care of and that he had not yet had a chance to do so. Thus reassured, the Plaintiffs went through with the closing.

On the next day, November 20, 1976, the Plaintiffs again visited the property. In checking the water they found that there was no improvement, so Mr. McIsaac himself undertook to flush the system. He ran the water all day and observed no improvement in the smell of the water. Again, on the next day, he flushed the system all day and the odor persisted.

The Plaintiffs moved into the house a week or so later. The water was still bad but the Debtor continued to reassure them. The Plaintiffs continued to flush the system. The running water filled the house with a putrid smell.

---

1. Although the transaction complained of was with a partnership and it is apparent the representations were made by the debtor as president of the partnership in furtherance of the partnership purpose, general partners are jointly and severally liable. Me.Rev.Stat.Ann. tit. 31 § 295; *see Francis v. McNeal*, 228 U.S. 695, 699–700, 33 S.Ct. 701, 702, 57 L.Ed. 1029 (1913). 60 Am.Jur.2d *Partnerships* § 163 at 83. A partnership is an entity distinct from its members "[b]ut the fact remains . . . that part-nership debts are debts of the members of the firm and the individual liability of the members is not collateral like that of a surety but primary and direct . . ." *Francis v. McNeal, supra.* Consequently a victim of a tort of a partner in furtherance of partnership business may choose to sue the partnership or one or more of its partners and may even single out a partner not personally involved in the tort. 60 Am. Jur.2d *Partnerships* § 163 at 84.

On December 20, 1976, at the Debtor's request, Mr. Partridge, who had originally drilled the well, visited the site. He resealed the well which cut off a vein of water located 27 feet under the surface.[2]

After Mr. Partridge resealed the well there was insufficient water to serve the requirements of the house. He then redrilled the well to 135 feet and was still unable to obtain sufficient water.

Finally, in the spring of 1977, the water stopped completely. The Plaintiffs arranged to hook a garden hose to a neighbor's water supply during the summer of 1977. During the winter of 1977 and 1978 the Plaintiffs dug a trench from the neighbor's house and buried the hose to keep it from freezing as a temporary solution to their problem.

On May 24, 1978 the Plaintiffs borrowed money and drilled a new well. The new well, although not completely satisfactory, is adequate.

The Debtor denies that he misrepresented the condition of the water to the Plaintiffs. He argues that he, in good faith, believed that a flushing of the system would correct the problem with the water system, that he was unaware of the odor of the water and that he acted in the utmost good faith in his efforts to solve the Plaintiffs' problems. The Court, upon the evidence, must find that the Debtor knew of the existence of the water problem and knew that a flushing of the system would not solve it.

The deposition of the Plaintiffs' neighbor, Joann Flood, which was admitted into evidence, demonstrates by clear and convincing evidence that the Defendant was aware of the odoriferous water several weeks before the Plaintiffs signed the contract for the purchase of the property. Mrs. Flood lived in the house next to the Plaintiffs, which she had purchased during the early summer of 1976. During that summer Mrs. Flood used the water from the Plaintiffs' water system daily for watering her new lawn and other landscaping. She described the water as "stinky water." She testified that with the lawn sprinkler on it smelled up the whole area.

The testimony of Mr. Partridge, the well driller, is also revealing. He testified that the Plaintiffs' well was the first one drilled within the development. He recalled that the Debtor was concerned about the old dump site and the obtaining of potable water. This means that the Debtor was aware of the old Town dump during December of 1975.

Further evidence of the Debtor's knowledge of the extent of the problem is the installation of the water softener on November 15, 1976, four days before the closing. There is no provision in the sale contract regarding a water softener. The Debtor's gratuitous installation of this equipment is further evidence that he was aware of the extent of the problem.

Despite the Debtor's denials and his good faith efforts to correct the problem after the fact, the Court must find that the Debtor, prior to the sale of the house to the Plaintiffs, and during the time that he was assuring and reassuring them about the water, the Debtor knew the extent of the problem and that further flushing of the system would not solve it.

Section 523 of the Bankruptcy Code provides:

(a) a discharge under section 727 . . . of this title does not discharge an individual debtor from any debt—

.    .    .    .    .

(2) for obtaining money . . . by—
(A) false pretenses, a false representation, or actual fraud. . . .

Section 523(a)(2) is derived, with only slight changes from Section 17(a)(2) of the old Bankruptcy Act. "Subparagraph (a) is intended to codify current case law *e.g. Neal v. Clark,* 95 U.S. 704, 24 L.Ed. 586

---

**2.** Although the evidence is not clear on this point, this vein could have permitted water from the old disposal site to get into the Plaintiffs' well and cause the offensive odor and taste. For the purpose of this decision a finding as to the cause of the odor and taste is not necessary.

(1887), which interprets 'fraud' to mean actual or positive fraud rather than fraud implied in law." 124 Cong.Rec.H. 11,096 (Sept. 28, 1978); S. 17,412 (Oct. 6, 1978); *In re Magnusson*, 14 B.R. 662, 667 (Bkrtcy.N.D. N.Y.1981); *In re Liberati*, 11 B.R. 54, 55 (Bkrtcy.E.D.Pa.1981). The fraud, usually denied, may be inferred from proven facts. *In re Boydston*, 520 F.2d 1098 (5th Cir. 1975); *In re Lyon*, 3 C.B.C.2d 644, 8 B.R. 152, ¶ 67,750 CCH Bankr.Rep. 78,406 (Bkrtcy.D.Me.1981).

 The Plaintiff must establish that the Debtor's false representation of material fact was knowingly and fraudulently made and that the representation was relied upon by the Plaintiff. *Commonwealth of Massachusetts v. Hale*, 618 F.2d 143 (1st Cir. 1980); *In re Archangeli*, 6 B.R. 50, 52 (Bkrtcy.D.Me.1980); 3 Collier ¶ 523.08[4] (15th ed.) It is not necessary, under Section 523(a)(2)(A), that the false representation be made in writing. *In re Archangeli*, 6 B.R. 48, 49 (Bkrtcy.D.Me.1980); 3 Collier ¶ 523.08[4] (15th ed.)

In the case under consideration the evidence is clear and convincing[3] that the Debtor knew that the water from the well had a foul odor and taste and that flushing of the system would not cure the problem. In order to induce the Plaintiffs to purchase the house he falsely and fraudulently (with intent to deceive) assured them that merely flushing the system would cure the problem.

This constituted a false representation of a material fact. The Plaintiffs, having no experience with wells or well water, reasonably relied upon the Debtor's repeated misrepresentation and went through with the purchase.

As a result of the Debtor's false representation the Plaintiffs have suffered some pecuniary loss. Their loss created a "claim" within the definition of Section 101(4) of the Code and a "debt" as defined by Section 101(11) and within the meaning and intent of Section 523(a)(2). The claim arose at the time of the sale of the property. It was at this time that the Debtor obtained money from the Plaintiffs by a false representation.

The Plaintiffs' loss is measured by the difference between the actual value of the property at the time of the purchase and its value if it had an adequate well. *See Horner v. Flynn*, 334 A.2d 194 (Me. 1975). The Plaintiffs claim that the property was valueless at the time of purchase because of the defective well. The Court cannot agree with this position.

The Court concludes that the difference between the actual value of the property and the value it would have had with an adequate well is $7,500. This figure is based upon the expense of drilling a new well, installing a new pump and other expenses necessary to put the property in the condition it was represented to be at the time of the sale.

It was necessary for the Plaintiffs to borrow the money in order to meet these expenses at an interest rate of 12% per annum. They are entitled to interest at 12% per annum on $7,500 from the date of the sale.

An appropriate order will be entered.

---

**3.** The plaintiff in dischargeability questions has the burden of proving all the elements of fraud by clear and convincing evidence. *In re Lyon*, 3 C.B.C.2d 644, 8 B.R. 152, ¶ 67,750 CCH Bankr.Rep. 78,406 (Bkrtcy.D.Me.1981); *In re Huff*, 1 C.B.C.2d 171 (Bkrtcy.D.Utah, 1979).